**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

Continental Resources, Inc., an Oklahoma )
corporation, )
                                )      **ORDER RE CONTINENTAL'S**
              Plaintiff, )      **SECOND MOTION FOR SUMMARY**
                                  )      **JUDGMENT AND MOTIONS**
                                  )      **IN LIMINE**
          vs. )
                                  )
Rick Fisher and Rosella Fisher, )      Case No. 1:18-cv-181
                                  )
          Defendants. )

---

This case was scheduled to be tried during the last two weeks of October, 2021. However, the court cancelled the trial and rescheduled it for August 2022. Pending at the time of cancellation were a second motion for summary judgment and a number of motions in limine—all brought by plaintiff Continental Resources, Inc. ("Continental"). This order addresses the pending motions.

## I.    BACKGROUND

### A.    Continental's drilling of a salt water disposal well on property owned by Fishers

Fishers are Montana residents who own the following contiguous tracts in Bowman County, North Dakota:

> Township 131 North, Range 106 West
> Section 8: SW¼
> Section 17: N½, NE¼SE¼
> Section 18: NE¼

Fishers' ownership is exclusive of the underlying minerals. Continental is an oil-and-gas exploration and production company that conducts oilfield operations in western North Dakota.

Fishers' property is located within the Cedar Hills North Red River "B" Unit ("Unit") established by the North Dakota Industrial Commission ("NDIC") effective March 1, 2001, to

1

unitize oil-and-gas operations within approximately 50,000 acres located in Bowman and Slope Counties in southwestern North Dakota.  Continental is the operator of the Unit.

In 2013, Continental drilled and completed a salt water disposal ("SWD") well on the NE¼ of Section 17, T131, R106W owned by Fishers.  The well is formally known as the Lonesome Dove 42–17 SWD well and will be referred to herein as the "42-17."  The 42-17 is one of four SWD wells that Continental operates within the Unit.  The remainder are not on Fisher land.

The 42-17 is a horizontal well and injects saltwater along the entire length of its lateral, which  extends horizontally approximately 4,461 feet from the vertical shaft drilled on Fishers' property.  Only about ⅓ of the lateral is on Fisher property.  The remaining ⅔'s extends onto adjoining property owned by third parties.

The formation into which the 42-17 injects saltwater is located  approximately 1½  miles below the surface and is known as the Lower Lodgepole Oolitic Zone ("Lodgepole").  The Red River "B" formation ("Red River") from which Continental is producing oil and gas is deeper and located several formations below the Lodgepole.

Prior to drilling and operating the 42-17, Continental needed to obtain an "aquifer exemption" from the EPA and the NDIC.   This is because Lodgepole into which bears water that is of sufficient quality to meet federal drinking water standards. The aquifer exemption granted by the NDIC is in the form of an order dated May 17, 2013.  It allows Continental to inject saltwater into an area of the Lodgepole that is within a ¼  mile of its lateral, with the dimensions of the "exempted area" being 4,128 feet in length, 2,640 feet in width, and 85 feet in thickness.  The aquifer exemption limits the amount of saltwater that may disposed through the 42-17 to 38,813,976 barrels.  The volume limitation is an amount calculated by the NDIC based on the volume of the

exempted area and the ability of the formation to receive and hold the saltwater, which is dependent upon several factors, including the formation's assumed porosity.  From a simplistic perspective, new barrels of saltwater injected into the formation may result in more saltwater occupying the same cubic feet of space within the exempted area (because there is additional capacity within that space to hold more saltwater under higher pressure) or saltwater being pushed into space previously unoccupied by saltwater.

Set forth below is a diagram from one of Fishers's experts showing the location of the 42-17 relative to the Fisher property and setting forth volume calculations by that expert in barrels of saltwater for:  (1) the Fisher property; (2) the exempted area into which Continental is permitted to inject saltwater; and (3) the intersection of the Fisher property and the exempted area.  The volume calculation by Fishers' expert for the exempted area is different from the NDIC's because he uses a lower value for the formation's porosity.  This difference is not material to the disposition of the pending motions as set forth below.



Figure 7.  PHIH map and volumetric polygons used in computing pore volumes.  Results of the calculations are tabulated above.

(Doc. No. 69-3, p. 24).

Even though Continental received its aquifer exemption from the NDIC in May 2013, it did not begin injecting saltwater through the 42-17 until October 2018.  This was its choice.  According to one of Fisher's experts, Continental reported to the NDIC in December 2020 that it had injected 1,240,550 barrels of saltwater up to that point.

**B.    The earlier <u>Fisher</u> action**

Before the 42-17 became operational, Fishers sued Continental in state court for claims of nuisance, trespass, fraudulent misrepresentation, deceit, and statutory damages under N.D.C.C. § 38–11.1–04.  Continental removed the action to this court and the case was docketed as <u>Fisher v. Continental Resources Inc.</u>, No.1:13-cv-00097 ("<u>Fisher I</u>").

 In the ensuing  litigation, Fishers contested Continental's claim that it had the right to use their property for saltwater disposal both as a general matter and it being an unreasonable exercise of the rights of the dominant mineral interests in this particular instance.  In the alternative, Fishers

claimed they were entitled to statutory compensation under N.D.C.C. § 38–11.1–04 for the use of their surface acreage as well as the underlying pore space to which they claimed ownership.  Fishers also sought other relief not relevant now.

In opposition, Continental contended it had the right to use Fishers' property for the 42-17 based on the purported dominancy of its mineral interests and as unit operator for the other mineral interest owners, and that its use in this particular instance is a reasonable exercise of the rights of the dominant mineral interests.  With respect to Fishers' § 38-11.1-04 claim for damages, Continental agreed it owed money for use of the surface of Fishers' surface estate but claimed with respect to the pore space that no money was owed because Fishers did not own the pore space.  In the alternative, Continental contended N.D.C.C. § 38-11.1-04 does not provide compensation for use of the pore space and, even if it did, there would be no compensable damage.

In a 2014 order in Fisher I, this court concluded that Continental as unit operator had the right to use Fishers' property for a SWD well but only if the use was reasonable, which the court stated to be a question of fact to be resolved in further proceedings.  At the same time, the court declined to take up the pore-space ownership issues due to inadequate development of the issues in the briefing.  However, the court did indicate in a footnote that good arguments existed for concluding that Fishers, as surface owners, owned the pore space and that damages could be collected pursuant to § 38-11.1-04 for Continental's use of the pore space.  Fisher I, 49 F. Supp. 3d 637, 648 n.3 (D.N.D. 2014).

Later, in 2015, the court did address the pore space issues.  The court concluded the pore space is part of the surface estate and is owned by Fishers.  The court further concluded that § 38-11.1-04, which allows for the recovery of compensation for damage to or use of the "surface owner's land[,]" extends to the pore space.  Finally, the court concluded it was premature to take up the issue

5

of what compensation would be due since Continental at that point had not begun using the 42-17.

Fisher I, 2015 WL 11400124.

In  May 2016, Fishers and Continental reached a partial settlement of what was at issue in

Fisher I culminating in the execution of a Stipulation to Dismiss ("Stipulation") that stated, in

relevant part, the following:

> Whereas the Fishers have initiated the above-captioned action, alleging, inter alia, claims for lost land value and lost use of and access to their land under Chapter 38-11.1 of the North Dakota Century Code, and have claimed they are entitled to compensation for (1) losses associated with the actual surface of the property where the Lonesome Dove Well site and associated infrastructure is located ("Surface Claims") and for (2) losses associated with the pore space into which produced water could be injected by the Lonesome Dove Well ("Pore Space Claims"); and

> Whereas the Parties wish to avoid the risk, time, expense, and aggravation of litigation with respect to the Surface Claims, and have therefore agreed to resolve all claims that arise from or relate to the use of the actual surface of the Subject Lands for construction of a well pad and related infrastructure, including claims related to any alleged fraudulent misrepresentation, deceit, nuisance or trespass ("Resolved Claims"), but not the claims related to the alleged use of pore space ("Unresolved Claims");

> Now, therefore, the Fishers and Continental stipulate and agree as follows:

> 1. The above-captioned case shall be dismissed with prejudice and without costs to either party with respect to the Resolved Claims.

> 2. The above captioned case shall be dismissed without prejudice and without costs to either party with respect to the Unresolved Claims.

> 3. If Continental begins using the Lonesome Dove Well for production water disposal operations, either party may, at their option, reopen the case for adjudication of the Unresolved Claims by filing an appropriate motion with the Court. Upon being reopened, the case shall continue as if it had not been closed, and the parties shall remain bound by all opinions and orders previously issued by the Court in the above-captioned action.

(Fisher I, Doc. No. 88).   The court then dismissed Fisher I pursuant to the Stipulation.

## C.     Continental commences this action upon deciding to begin using the 42-17 to dispose of saltwater

On September 9, 2018, Continental commenced the present action.  In its complaint,

Continental announced it would begin injecting saltwater using the 42-17 within 30 days of

6

commencement of the action.  After reciting the prior rulings made in <u>Fisher I</u>, Continental alleged

upon information and belief that the Fishers would be claiming they are entitled to compensation

for Continental's use of and damage to their pore space resulting from its operation of the 42-17.

Continental stated it was seeking a declaration that Fishers would not suffer compensable damages

resulting from its injection of saltwater into the pore space.  In addition, Continental also stated it

was seeking a declaration that its use of the 42-17 would be a reasonable exercise of its dominant

mineral interests—an issue held open in <u>Fisher I</u>.  (Doc No. 1).  Continental stated it was seeking

a jury trial on all issues triable to a jury.

Fishers answered Continental's complaint contending that Continental is not entitled to the

relief it requested.  In addition, Fishers asserted a counterclaim for compensation for Continental's

use of and damage to their pore space caused by operation of the 42-17.

> **D.     The North Dakota Legislature's passage in April 2019 of legislation that would eliminate any right to recover for use of pore space under ch. 38-11.1 and the state court action challenging the constitutionality of that legislation**

In April 2019, the North Dakota Legislature passed Senate Bill 2344 that amended N.D.C.C.

chs. 38-08, 38-11,  and 47-31.  Among other things, the 2019 amendments would eliminate the right

of the surface owner to recover compensation for use of the pore space under § 38-11.1-04—at least

as of the effective date of the law, which the court understands to be August 1, 2019.

Subsequently, a state district court concluded that Senate Bill 2344 is unconstitutional in its

entirety (at least under the North Dakota Constitution) and enjoined its enforcement.  <u>Northwest</u>

<u>Landowners Ass'n v. State of North Dakota</u>, No. 05-cv-00085 (N.D. Dist. Ct., N.E. Jud. Dist.,

Memorandum Opinion Jan. 21, 2021) (Benson, Swain D.J.).  This ruling was appealed to the North

Dakota Supreme Court.  Continental is a party to the state action as an intervenor-defendant.  <u>Id.</u>

During a hearing held on the pending motions, counsel advised that the North Dakota

Supreme Court had remanded the state action to the district court for a ruling on plaintiffs' entitlement to costs and attorney fees before proceeding further with the appeal. The expectation at the time of the hearing was that the district court would rule shortly and the case would return to the North Dakota Supreme Court for decision. How the North Dakota Supreme Court rules may very well have a dramatic impact on the scope of any damages recoverable in this action. This point will be returned to later.

### E. Fishers' calculation of damages and the North Dakota Supreme Court's decision in <u>Mosser v. Denbury</u>

The only claim of damages that Fishers are making in this case is for compensation pursuant to N.D.C.C. § 38-11.1-04 for damages allegedly sustained resulting from loss of "use of" or "access to" pore space underlying their property resulting from the injection of waste water by Continental. For ease of discussion, the court will refer to both as simply "loss of use."

The *only* method of calculating damages for the claimed loss of use that has been disclosed by Fishers is presenting evidence of what others are paying for injection of waste water on a per-barrel basis and multiplying that amount first times the amount of saltwater injected to date and then again by amounts their expert projects Continental will dispose of in the future and discounting the later amounts to present value. Fishers claim that compensation based upon a per-barrel amount for injected saltwater is analogous to rent for use of the pore space for which they are claiming compensation and is a method of calculating damages for loss of use endorsed by the North Dakota Supreme Court in <u>Mosser v Denbury</u>, 2017 ND 169, 898 N.W.2d 406 (2017) ("<u>Mosser</u>")—at least with respect to past injections.

This court is well-familiar with North Dakota Supreme Court's decision in <u>Mosser</u> since it arises out of a case in this court where the plaintiffs, like Fishers in this case, were seeking to

8

recover damages under ch. 38-11.1 for lost use of their pore space by injections of saltwater.  In that case, the undersigned certified a number of questions to the North Dakota Supreme Court, primarily to address the thorny questions with respect to the scope of  § 38-11.1-04's compensation remedy with respect to use of pore space deep below the surface as well as what may be relevant evidence of damage.  However, believing it unfair to ask the North Dakota Supreme Court to answer questions directed solely to the compensation issues in a vacuum, the undersigned posed two questions directed to the overarching issues the undersigned  had already decided based upon a prediction of what the North Dakota law is, *i.e.*, the surface owner owns the underlying pore space (at least absent a conveyance) and that damages are recoverable by a surface owner under § 38-11.1-04 for a mineral developer's use of the pore space for disposal of saltwater.  Mosser, No. 1:13-cv-148, 2016 U.S. Dist. LEXIS 160376, at **7–22 (D.N.D. Nov. 18, 2016) (request to answer certified questions); Mosser, 2017 ND 169, ¶¶ 14, 18.

The first certified question the undersigned posed in Mosser was:

> 1. In North Dakota, does the owner of the surface estate own the pore space deep below the surface, absent some conveyance of the pore space to a third party and even when the mineral estate has been severed from the surface estate?

In its discussion of that question, the North Dakota Supreme Court discussed the interplay between § 47-01-12 and the more recently enacted ch. 47-13.  The court stated:

> [¶ 16] Chapter 47–31, N.D.C.C., was enacted in 2009 N.D. Sess. Laws ch. 401 in conjunction with provisions for carbon dioxide underground storage in 2009 N.D. Sess. Laws ch. 318. The legislation codifying pore space policy was intended to confirm that surface owners own the pore space under their surface estate. See Hearing on S.B. 2139 Before Senate Natural Resources Comm., 61st N.D. Legis. Sess. (Jan. 16, 2009) (written testimony of Assistant Attorney General Charles Carvell). That testimony is consistent with N.D.C.C. § 47–01–12, N.D.C.C., which dates back to 1877 Civil Code for the Dakota Territory, and states the "owner of land in fee has the right to the surface and to everything permanently situated beneath or above it."

Id. at ¶ 16.  Following that discussion, the court concluded "the owner of a surface estate owns the

underlying pore space absent a conveyance of the pore space to a third party before April 9, 2009."

Id. at ¶ 17. It then answered the question "Yes."

> The second certified question the undersigned asked was:
>
> 2. If the answer to the first certified question is yes, do the provisions of N.D.C.C. § 38–11.1–04 that require compensation be paid to a surface owner for "lost land value" and "lost use of and access to" a surface owner's land extend to a mineral developer's use of the subsurface pore space for the disposal of saltwater generated as a result of drilling operations?

The North Dakota Supreme Court answered that question as follows:

> When the provisions of N.D.C.C. §§ 38–11.1–04, 47–01–04, and 47–01–12 are read together, we agree with the interpretations by the federal magistrate judge and the federal district court that pore space is part of the surface owner's interest in the land for purposes of N.D.C.C. § 38–11.1–04. We conclude a surface owner may be entitled to compensation under N.D.C.C. § 38–11.1–04 for a mineral developer's use of the surface owner's subsurface pore space for disposal of saltwater generated as a result of drilling operations. We answer the second certified question "yes."

Id. at ¶ 24.

> The five other questions the undersigned certified addressed evidentiary issues for a surface owner claiming compensation under § 38-11.1-04 for use of pore space for saltwater injection. As recounted by the North Dakota Supreme Court, the questions were as follows:

> 3. If the answer to the second certified question is yes, is the ability to recover damages under N.D.C.C. § 38–11.1–04 limited to when the surface owner is currently using the pore space or when there is evidence that the surface owner is likely to make use of the pore space within the reasonably near future, either by personally using it or leasing it to another?

> 4. Are damages under N.D.C.C. § 38–11.1–04 for a mineral developer's use of subsurface pore space for disposal of saltwater recoverable only if the surface owner can prove a diminution in the market value of the affected property?

> 5. In order to recover damages for a mineral developer's use of subsurface pore space for the disposal of saltwater under N.D.C.C. § 38–11.1–04, must the surface owner prove some damage other than the mere occupancy or loss of access to the pore space, e.g., an interference with the surface owner's actual use of the pore space or a concrete plan to do so in the reasonably near future or evidence of diminution in the market value of the property affected by the saltwater disposal?

> 6. Can a surface owner recover damages under N.D.C.C. § 38–11.1–04 for a mineral developer's use of the surface owner's pore space for the disposal of saltwater when the only

10

evidence upon which to calculate damages is (1) proof of what is being paid to other surface owners for the use of their pore space for the disposal of saltwater on a per barrel basis (assuming the third party transactions being relied upon are "arms length" and fairly comparable); and (2) evidence of the number of barrels of injected saltwater that, more likely than not, is occupying the surface owner's pore space?

7. If a surface owner can recover damages under N.D.C.C. § 38–11.1–04 for a mineral developer's use of the surface owner's subsurface pore space based on an amount per barrel for barrels of saltwater injected into the subsurface, can the surface owner in the same action recover additional damages based on an estimate of how may more barrels of saltwater could be injected into the pore space if the surface owner is able to prove, more likely than not: (1) the mineral developer's disposal of saltwater has foreclosed the ability of the surface owner to make use of the remaining capacity in the formulation into which the saltwater is being injected; and (2) the remaining capacity of the formation into which the saltwater is being injected?

Id. at ¶ 25.

The North Dakota Supreme Court responded to these questions stating:

[¶ 27] The federal magistrate judge's order for certification generally described the evidentiary background for the five remaining certified questions:

In this case, the only evidence of damage that plaintiffs will be offering is evidence that the saltwater being disposed of by Denbury is occupying their pore space and what others are paying to surface owners for subsurface disposal of saltwater. Denbury claims this is not enough to recover under § 38–11.1–04 if it applies. Denbury contends that there must be some evidence that plaintiffs were either using the pore space or, perhaps, had some concrete plans to do so in the near future. Further, even if actual or intended use is not required, Denbury contends that plaintiffs must at the very least proffer some evidence that their property has diminished in value. According to Denbury, in the absence of plaintiffs being able to prove any of these things (e.g., interference with an actual or intended use or, perhaps, loss of land value), plaintiffs have failed to prove that they have sustained damage within the meaning of the statute and their claim pursuant to § 38– 11.1–04 must be dismissed.

Questions three through six go to whether plaintiffs can recover damages on a per barrel basis for the saltwater that plaintiffs can demonstrate is occupying their pore space based only on evidence of what others are paying surface owners for the disposal of saltwater or whether § 38–11.1–04 requires something more. If those questions are answered in manner that allows plaintiffs' claim to go forward, then question seven goes to whether plaintiffs can also recover for pore space that Denbury has not yet utilized if plaintiffs can convince the factfinder that Denbury's disposal of saltwater has foreclosed their future use of that pore space.

[¶ 28] We consider these five certified questions based on the federal magistrate judge's explanation of the evidence and statement that questions three through six, in particular, will have to be addressed in some fashion in Denbury's pending motion for summary judgment. On this record, we conclude the answers to questions three through six may be determinative of this action and there is no controlling precedent on those issues in

the decisions of this Court. See N.D.R.App.P. 47.

[¶ 29] The plain language of N.D.C.C. § 38–11.1–04 requires a mineral developer to pay a surface owner a sum of money equal to the amount of damages sustained by the surface owner for lost land value, lost use of and access to the surface owner's land, and lost value of improvements caused by drilling operations. The plain language of that statute is not limited to whether the owner of a surface estate is currently using or planning to use the pore space in the near future. Rather, the statutory language requires the mineral developer to pay the surface owner for "lost land value, lost use of and access to the surface owner's land, and lost value of improvements." That language is not limited to a diminution in market value of the owner of the surface estate's interest and includes a surface owner's lost use of and access to a surface owner's pore space at some time in the future regardless of the surface owner's current use or future plan for use of the pore space. That interpretation is consistent with the legislature's stated purpose for N.D.C.C. ch. 38–11.1 "to provide the maximum amount of constitutionally permissible protection to surface owners and other persons from the undesirable effects of development of minerals" and the legislature's separate rule of construction that N.D.C.C. § 38–11.1–04 "must be interpreted to benefit surface owners." N.D.C.C. § 38–11.1–02.

[¶ 30] Moreover, the plain language of N.D.C.C. § 38–11.1–04 does not preclude a surface owner from recovering what others may be paying to dispose of saltwater in pore space; rather, the price per barrel others are paying for saltwater disposal may provide some probative evidence of the amount a surface owner may be damaged for "lost use of and access to the surface owner's land" under N.D.C.C. § 38–11.1–04. We do not speculate on the extent of the evidence a surface owner may proffer to establish lost use of and access to a surface owner's land, because the probative effect and admissibility of proffered evidence is a matter for a trial court's discretion. See F.R.Ev. 401–403 and N.D.R.Ev. 401–403. Rather, for purposes of these certified questions, we conclude certified questions 3 through 6 may be determinative of this action and answer "no" to questions 3 through 5 and "yes" to question 6.

[¶ 31] In formulating question 7, however, the federal district court said it anticipated the plaintiffs will offer evidence that Denbury's saltwater disposal has foreclosed their ability to use or otherwise access the remaining pore space under their surface estate. The court's explanation indicates question 7 is based on Denbury's anticipated future conduct as well as potential regulatory or physical barriers to accessing any remaining pore space, none of which is certain to occur. We decline to speculate on what evidence might be used to show foreclosed access to remaining pore space, and we decline to answer question.

Id. at ¶¶ 27–31.

Particularly relevant now, are the following conclusions by the North Dakota Supreme Court

in Mosser:

• The relevant statutory language and other provisions of North Dakota law do not

require the surface owner to prove a diminution in the market value of the surface

12

owner's property in order to recover damages for loss of use of pore space. Evidence of what others are paying for disposal of saltwater *may* provide some probative evidence of the amount a surface owner may be damaged for loss of use of the pore space, subject to the limitations imposed by Fed. R. Evid. 401–403 or comparable state rules of evidence.

- The relevant statutory language does not require a surface owner to prove he or she was currently using the pore space or had concrete plans to do so in the future in order to be able recover damages from loss of use of the pore space.

Also, particularly relevant is the North Dakota Supreme Court's decision not to answer question 7 that was directed to whether a surface owner could recover for loss of use of pore space not occupied by current injections of saltwater but which allegedly the surface owner has been deprived of using because of the permitted disposal well.   Notable in the court's discussion set forth above were concerns that any such recovery may be predicated upon assumptions of what will be the future conduct of the disposal well operator as well as any potential regulatory or physical barriers and the uncertainty that may exist with respect to these assumptions.

### F.   Continental's earlier motion for summary judgment

In an earlier motion for summary judgment, Continental took another run at arguing that Fishers have no right as a matter of law to recover compensation for injections of saltwater into the pore space underlying their property.  The court rejected that argument concluding it was foreclosed by this court's decision in <u>Fisher I</u> as well as by the stipulation of the parties that they would remain bound by the decisions in the earlier action.  <u>Continental Resorces, Inc. v. Fisher</u>, No 1:18-cv-181, 2021 WL 665102 (D.N.D. Feb. 19, 2021).

Continental also argued in its earlier motion for summary judgment that it would owe

nothing for injections of saltwater made after July 31, 2009, given the effective date of August 1, 2009, for SB 2344.  The court rejected that argument, relying at that point upon the decision of the state district court that had declared SB 2344 unconstitutional.  However, given that this court's rejection of Continental's argument was not a final judgment, it is subject to change if the North Dakota Supreme Court concludes SB 2344 is constitutional and the court otherwise concludes that reliance upon SB 2344 is not foreclosed by the court's earlier decision in <u>Fisher I</u> and/or the parties' Stipulation.

### G. Continental's representation in its briefing on the pending motions that it would cease using the 42-17 for saltwater disposal as of the end of the 2nd quarter of 2022

Continental claimed in its motion for summary judgment that it was planning to cease operating the 42-17 by the second quarter of next year.  And, as late as August 21, 2021 in its reply brief, Continental argued the court should treat as an established fact that:  "(4) Continental will cease injection into the 42-17 at the end of Q2 2022."  (Doc. No. 83).  Continental stated that, instead, it would dispose of the saltwater by injecting it back into the Red River from which it is producing oil and gas.  Consequently, according to Continental, Fishers' claims for damages for future injections must be denied—at least for injections beyond the 2nd quarter of 2022.

It is not entirely clear to the court when Continental first decided it was planning to cease using the 42-17.  Fishers' counsel states he first became aware of the plan with Continental's disclosure of an expert report in mid-April of this year—long after the close of fact discovery and after Fishers made their initial expert disclosures.

As discussed in more detail in what follows, Continental's assertion that it was an established fact it would be ceasing operation of the 42-17 as of the end of the 2nd quarter of 2022 became inoperative, at least in part, after the court raised questions about it.

**H.    The court's posing of questions to counsel, the hearing on the pending motions, and the court's decision to postpone the trial**

Upon reviewing the pending motions (including particularly the expert reports), the court became concerned about the degree of speculation involved in that part of Fishers' claim for damages that is based upon projections of future injections.  Further, the court's concern was heightened by Continental's representations that it would cease using the 42-17 altogether as of the end of the 2nd quarter 2022.

In addition, the court was concerned that Fishers' claim of entitlement to compensation for projected injections of saltwater *may* be incompatible with what N.D.C.C. § 38-11.1-04 permits in terms of recovery.  This concern was based upon what admittedly may be the over-simplistic notion that each barrel of injection of saltwater either occupies new pore space or reduces the volume available for storage in previously occupied pore space and N.D.C.C. § 38-11.1-04 arguably only permitting recovery for pore space that has been used or physically prevented from using and not that which might occur in the future.  And, if that is the case, one of the consequences may be that the Fishers can only seek compensation for the amount of saltwater injected to date, but would have the opportunity to bring successive actions for compensation for future injections.  At that point, neither party had argued for this as an outcome.

Finally, the court was also concerned that lurking in the background is the possibility that the North Dakota Supreme Court might reverse the state district court's decision holding Senate Bill 2344 unconstitutional.  If that occurred and if this court concluded that Fishers have no right to recover for saltwater injections beginning as of August 1, 2019, then the amount at issue in this case would likely be small given the court's understanding that the quantity of saltwater disposed of by Continental prior to that date was minimal.

Because of these concerns, the court scheduled a hearing on the pending motion for summary judgment and motions in limine, which was held on September 3, 2021.  Prior to the hearing, the court advised the parties it would address Continental's plan to cease using the 42-17 as well as the possibility the court might limit Fishers to recovering only for what has been injected up to the time of trial and that successive actions would have to be brought for future injections.  The court also advised it would address the question of whether it would make sense to postpone the trial until the 3rd quarter of 2022 after Continental ceased using the 42-17.

During the hearing, Continental jumped on the court's concern over what maybe  the scope of recoverable damages under N.D.C.C. § 38-11.1-04, contending that Fishers' ability to recover damages, if at all, must be limited to what has been injected to date.  In response, Fishers' counsel contended it was not that simple.  He argued that Continental has tied up all of the pore space under the Fisher property that is within the permitted area for disposal based on the assumption the NDIC would not allow another entity to dispose of saltwater within the permitted area.  And, if that is the case, Fishers' counsel argued his clients are entitled to recover damages now for loss of use of all of the pore space within the permitted area, even though only a small fraction of it is presently occupied by injected saltwater and the extent to which the remainder may ever be occupied is highly uncertain.

With respect to Continental's assertion it would cease operation of the 42-17 as of the end of the 2nd quarter of 2022, what was argued to be an established fact as late as two weeks prior to the hearing suddenly became inoperative—at least in part.  During the hearing, Continental's counsel stated his client's "present plan"  is to first conduct a pilot project of injection of saltwater back into the Red River from which it is producing oil and, if that proves to be successful, then any cessation of use of the 42-17 would likely not occur until sometime in 2023.  Any cessation of use

of the 42-17 in the near term (whether it be in 2022 or 2023) significantly reduces what is at stake in this case or in any successive actions if that is the route the court took.

Finally, with respect to the appeal to the North Dakota Supreme Court and the possibility that it might hold SB 2344 to be constitutional all or in relevant part, it has always been Continental's position that Fishers cannot recover for injections of saltwater after the effective date. While not conceding that to be the case, Fishers' counsel acknowledged this is an issue and potentially a significant problem for his clients.

Because (1) the court needed more time to sort out the issue of whether Fishers are limited in this action to recovery for injections of saltwater up to the date of trial with ability to bring successive actions for future injections, (2) the uncertainties created by Continental's announced plans to cease using the 42-17, and (3) the possibility the North Dakota Supreme Court might conclude SB 2344 is constitutional and that dramatically limiting any recovery in this action, the court postponed the trial until August 2022 with the possibility that further extensions may be prudent if Continental's cessation of use of the 42-17 is at that point imminent. (Doc. No. 111).

## II.   CONTINENTAL'S SECOND MOTION FOR SUMMARY JUDGMENT

### A.   Governing law

The court is well aware of the principles governing motions for summary judgment. See, e.g., Celotex Corp. v Catrett, 477 U.S. 317 (1986); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc); East Central Regional Water Supply v. City of Grand Forks, No. 3:20-cv-208, 2021 WL 5344739, at *5 (Nov. 16, 2021) (Welte, C.J.).

### B.   Continental's argument that any recovery by Fishers violates the Contracts Clause is a nonstarter

One of the arguments made by Continental in support of its motion for summary judgment

is that Continental will be deprived of valuable contract rights in violation of the Contracts Clause if Fishers are allowed to recover compensation for injected saltwater. In support, Continental cites to Ass'n of Equipment Mfrs v. Burgum, 932 F.3d 727, 730–31 (8th Cir. 2019).   This is the sum and substance of Continental's argument— an *ipse dixit* declaration that contract rights will be impaired with no explanation as to how or why, much less any identification of the contract(s) that purportedly would be impaired.

The court rejects Continental's newly-minted Contracts Clause argument for lack of prior pleading as well as development.   Further, this argument is simply another attempt to relitigate issues that were adjudicated or could have been raised in Fisher I.   Hence, the argument has been waived for the same reasons the court rejected Continental's earlier argument in this case that attempted to relitigate what had been decided in Fisher I.[1]

### C.    Continental's argument that Fishers have failed to demonstrate they have sustained any damages recoverable under § 38-11.1-04  is without merit

Fishers seek recovery pursuant to the following provision of N.D.C.C. § 38-11.1-04:

> The mineral developer shall pay the surface owner a sum of money equal to amount of damages sustained by the surface owner . . . , if any, for lost land value, lost use of and access to the surface owner's land . . . .

Focusing upon the words  "damages sustained,"  Continental argues that it is not enough for Fishers to prove that they have lost use of the pore space being occupied by the saltwater being disposed of. Rather, according to Continental, Fishers must offer some evidence of damage that is compensable. While Continental does not articulate what those damages may be, one might be diminution in value of Fishers' surface estate.  Another might be that Fishers lost an imminent opportunity to use

---

[1]   While it is impossible to address the argument without Continental having identified the contracts purportedly impaired and tendered copies, the court is highly skeptical as to its validity.  See Murphy v. Amoco Production Co., 729 F.2d 552, 557-58 (8th Cir. 1984) (a legitimate exercise of the police power that affects existing contracts does not necessarily violate the Contracts Clause).

the pore space themselves, either by drilling their own disposal well or leasing the pore space to another operator for saltwater disposal or some other purpose, *e.g.* disposal of $CO_2$ or injection of natural gas for underground storage.

The unit operator in <u>Mosser</u> made this very same "damages sustained" argument and the North Dakota Supreme Court rejected it. As noted in detail above, the North Dakota Supreme Court concluded that the relevant statutory language should be construed liberally to permit a surface owner to recover compensation for occupation of their land (including pore space), even if the surface owner had no present plans for putting the land to a particular use either by using it themselves or leasing it to others. In addition, the North Dakota Supreme Court also concluded that a surface owner was not limited to recovering any diminution in value of the surface estate that may result from use of the pore space for saltwater injection.

Here, it is undisputed that Continental is injecting saltwater into Fishers' pore space and Fishers have proffered expert testimony that is more than sufficient to create (at the very least) a jury issue that some of their pore space is being occupied by saltwater injected by Continental and they have lost full use of that pore space as a consequence. As this court reads <u>Mosser</u>, this evidence, if accepted by the jury, is sufficient to permit recovery of compensation under N.D.C.C. § 38-11.1-04.

D. **Fishers' "future damages" evidence will be excluded as being unduly speculative**

To reset the table, Fishers seek compensation not only for the saltwater injections Continental has made to date but also for future injections. One of Fishers' experts provides five estimates of amounts of saltwater Continental will inject on a yearly basis over the next decade or so and labels the estimates as follows: "low side;" "low-side expected;" "expected"; "high-side expected;" and "max." The "max" estimate is based on future injections reaching a total of

38,813,976, which is the limit set forth in Continental's aquifer exemption. The "low-side" estimate assumes Continental's present low rate of injection continues for some period and then declines at a 4% exponential rate.   Fishers' expert tosses out the "low side" and "max" estimates as unlikely, leaving the remaining three estimates as being more probable.   For the "expected" and "high-side expected" forecasts, Fishers' expert substantially increases the yearly injection amounts when the expert predicts that the Lonesome Dove 1-21 (another of Continental's SWD wells) will have no longer be permitted to be used because it will have reached what Fisher's expert contends would be the limit of its aquifer exemption.

Another Fisher expert then takes the five forecasts of future injections, multiplies the yearly estimated injection amounts for each forecast times a potential per-barrel payment amount, reduces the resulting stream of payments to present value, and then sums the amounts.   He does this for a range of per-barrel payment amounts of from $.05 per barrel to $.12 per barrel.   The following table provides a summary of his calculations of the recoverable amount for future injections discounted to present value:

| Injection Forecast | Payment per Barrel of Water | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | $0.05 | $0.06 | $0.07 | $0.08 | $0.09 | $0.10 | $0.11 | $0.12 |
| Low Side | $155,000 | $186,000 | $217,000 | $248,000 | $279,000 | $310,000 | $341,000 | $372,000 |
| Low Side Expected | $657,000 | $789,000 | $920,000 | $1,051,000 | $1,183,000 | $1,314,000 | $1,446,000 | $1,577,000 |
| Expected | $916,000 | $1,099,000 | $1,249,000 | $1,427,000 | $1,606,000 | $1,784,000 | $1,962,000 | $2,141,000 |
| High Side Expected | $1,017,000 | $1,220,000 | $1,424,000 | $1,627,000 | $1,830,000 | $2,034,000 | $2,237,000 | $2,440,000 |
| Max Case | $1,190,000 | $1,428,000 | $1,666,000 | $1,904,000 | $2,142,000 | $2,380,000 | $2,618,000 | $2,856,000 |

(Doc. No. 71-3, p.5).   Without going into all of the detail, the three forecasts deemed the most probable are based upon a number of assumptions that include, but are not limited to, the following:

- the future price of oil;

- the economic life of the formation from which oil is being recovered;

- the percentage of saltwater disposed of through Continental's saltwater injection wells (including the 42-17) versus how much is re-injected into the formation from which oil is produced;

- the amounts of saltwater that Continental disposes through it other injection wells versus how much it disposes through the 42-17;

- *if* and *when* the Lonesome Dove 1-21 SWD (another saltwater disposal well operated by Continental) reaches any limit that may be imposed by EPA and the NDIC.

With respect to the Lonesome Dove 1-21, there is some question whether there is any practical limit imposed by its aquifer exemption. Also, there are substantial questions with respect to whether any present limitations can be relaxed. In addition, there is the possibility of the life of the Lonesome Dove 1-21 being extended by re-drilling the well to a new formation for saltwater disposal and obtaining a new aquifer exemption for that formation if one is required.

The extent to which Continental can operate the Lonesome Dove 1-21 in the future has a significant impact on the above forecasts for use of the 42-17 as acknowledged by Fishers' expert.[2] Of course, it goes without saying the same is true for the future price of oil.[3] In addition, none of

---

[2] Fishers' expert testified in his deposition:

Q.   In Assumption 4, you talk about the disposal life of the 1-21 well will have a big impact on your assumed forecast; is that correct?

A.   Correct.

[3] Fishers' expert testified:

Q.   * * * * You list some variables that your forecasts depend upon. So you talked about future oil prices as being the first one; is that right? And I'm on Page 13, Subparagraph 1.

A.   Okay.

Q.   you talk about future oil prices?

A.   Yes.

Q.   And, you know, that's just something we don't know whether they're going to be ten or whether they're gong to be a hundred?

A.   Absolutely.

the forecasts take into account the economic impact of Continental having to pay a per-barrel amount for disposal of saltwater using the 42-17, which may very well be material, particularly if it runs into the millions of dollars. (Doc. No. 69-2, p. 192). Finally, none of forecasts take into account the possibility that Continental may cease using the 42-17 in the relatively near future, whether it be in 2022 as originally represented or in 2023. (Doc. No. 69-2, pp. 180–82).

Continental argues, both in its motion for summary judgment and in one or more of its motions in limine, that Fishers' "future damage" evidence is unduly speculative and should not be permitted. Fishers disagree and appear to offer three justifications for why they are entitled to compensation for future injections now. The first is their contention that it would be fundamentally unfair not to permit them to recover for additional use or occupancy of their pore space simply because the proof that they are prepared to offer is based upon estimates, particularly if this is their one shot at obtaining compensation

"It is well-established [under North Dakota law] that damages based upon a mere possibility of occurrence in the future or speculation or conjecture are not allowed." Matter of Estate of Ridl, 455 N.W.2d 188, 195 (N.D. 1990). After carefully considering all of the potential variables, the court concludes that any award of compensation based upon the evidence Fishers intend to present with their experts as to potential future injections would be unduly speculative—even without Continental ceasing to use the 42-17 in 2022 or 2023. As for Fishers' fairness concern, this can be dealt with by allowing Fishers to bring successive actions for future injections resulting in additional loss of use of pore space, and limiting this action to recovery of compensation for past saltwater

---

Q.     So that's an assumption you had to make?
A.     Absolutely. Yes. My fault.

injections.[4]

Fishers' second argument for why they should be entitled to recover compensation now for predicted future injections is that Continental has tied up all of the pore space within the area of the aquifer exemption granted by the NDIC.  Hence, according to Fishers, they have  been deprived of use of that pore space from day one.

Continental argues (and Fishers' counsel does not dispute) that there is nothing in the existing laws and regulations governing the NDIC that limits its ability to allow multiple entities to inject saltwater into the same area covered by Continental's aquifer exemption.  In other words, there is nothing that explicitly makes Continental's aquifer exemption exclusive.  Further, Fishers have not  pointed to any instances where the NDIC has denied a request by an entity to inject saltwater into a formation because another entity has been granted an aquifer exemption for the same area. On the other hand, Continental has not pointed to any instances where the NDIC has allowed multiple entities to inject saltwater into the same exempted area.  The reason neither party has been able to do so is that the issue likely has never before come up.

While the undersigned is skeptical as to whether the NDIC would permit two different entities to dispose of saltwater within the same exempted area (particularly if the first permitted entity objected), this is a regulatory unknown of the same character as those the North Dakota Supreme Court expressed concern about when it refused to opine in Mosser as to whether surface owners should be permitted to seek recovery for loss of use of their remaining pore space.  Perhaps, in another situation a surface owner could seek compensation for loss of use of unoccupied pore space purportedly tied up by an NDIC permit based upon proof of diminution in value of the pore

---

[4]    In addition to being speculative, the court suspects that any evidence plaintiffs may offer with respect to what others are paying for saltwater disposal is for compensation for present injections and nothing more.

space (although that may be very difficult to show).  The problem remains in this case, however, that Fishers' chosen method of seeking compensation (*i.e.*, recovery based on forecast amounts of what may be injected in the future and seeking compensation for those amounts on a per-barrel basis) is simply too speculative to permit such a recovery, even if the streams of purported damage amounts are reduced to present value.  The court suspects, however, that, if the North Dakota Supreme Court was presented with this specific issue, it would conclude there could be no recovery for loss of use of unoccupied pore space covered by Continental's aquifer exemption— at least not until Fishers (or someone with whom they have contracted with) has been denied use of the same previously permitted pore space by the NDIC.  Cf. Matter of Estate of Ridl, 455 N.W.2d at 195 (not permitting a future damage award for potential IRS penalties and interest that may or may not be assessed).

A third Fisher justification appears to be the claim of one their experts that saltwater injected on neighboring lands will ultimately flow back onto Fisher pore space based on the purported directional flow of underground water.  Without going into all of the detail, the court concludes this opinion is too speculative for purposes of permitting compensation for future injections.  Fishers' expert conceded that the saltwater disposed of to date will likely not migrate beyond  the ¼ mile radius of the 42-17 and that the same is true of his "low-side expected" estimate.  (Doc. No. 69-2, pp. 129–32).  Further, even at higher volumes of injection, Fishers' expert was not able to put a time on when the saltwater might migrate back onto Fishers' property.  Also, there appears to be a number of other factors that may affect the claimed directional flow of water.  Finally, the possible migration of saltwater based on the directional flow of underground water appears to be too attenuated to the claim of loss of use of the pore space in terms of capacity to hold injected

saltwater.[5]

**E.**     **Fishers will be permitted to elect limiting this action to recovery of loss of pore space resulting from saltwater injections to the date of trial and retain the right to bring successive actions for any future loss of use of or access to pore space**

With the court's denial of Fishers' claim for damages based on projected future injections, Continental should not get a free pass from having to pay compensation for additional pore space it occupies in the future.  Given the nature of what we are dealing with (*i.e.*, continuing use and occupancy of new pore space as more saltwater is injected but the extent to which is difficult to predict), it is appropriate to allow Fishers to bring successive action in the future for additional lost of use  pore space  resulting from future injections and restrict any recovery in the present action to what has been injected to the date of the trial.  Notably, and without waiving any other objections, Continental acquiesced to Fishers' ability to bring successive actions when it urged the court during the hearing to limit the present action to historical injections with the understanding Fishers could bring additional actions within the appropriate statue of limitation to address future injections. (Doc. No. 113, p. 14).

Finally, there may be some question as to whether Fishers must affirmatively elect to seek recovery for amounts loss of use or access to pore space resulting from injections up to the date of trial and reserve the opportunity to seek for additional losses resulting from future injections in successive actions.  While the court believes that Fishers have essentially made this election given the method of calculating damages they have chosen, the court will in its orders set forth below allow Fishers to make a formal election.

---

[5]  If at some point in the future saltwater injected by Continental onto neighboring lands does migrate back into Fisher pore space, perhaps Fishers at that point could sue if they can prove they have been damaged.

**F.     Continental's argument that any recovery by Fishers based upon amounts per barrel for injected saltwater should be limited by the percentage of the length of the 42-17's lateral that is on Fishers' property**

As discussed earlier, approximately 2/3's of the 42-17's lateral from which saltwater is injected is not on Fishers' property. For this reason, Continental asks the court to limit any recovery by Fishers calculated using amounts per barrel for injected saltwater to 33.35% of the injected amounts. Fishers appear to offer two reasons for why the court should not do so.

One reason offered by the Fishers is the opinion of their expert that the amount of saltwater injected along the lateral is not uniform and more will be injected at or near the "heel" of the lateral which is on Fishers' property. However, Fishers' expert was not able to quantify in any meaningful manner in his deposition testimony the extent to which that may be true.

Fishers also contend that the direction of flow of underground fluid may result in some of the saltwater injected on neighboring land moving and occupying their pore space. However, it appears from their expert's report and deposition testimony that, if this occurs at all, it would be at some point well into the future and may very well be dependent upon the quantities of saltwater ultimately injected. After carefully reviewing Fishers' expert opinions, there has been a failure to demonstrate any substantial probability of this occurring with the amounts of injected saltwater that will be considered in this action.

The court concludes that Continental's argument has substantial force and will not permit Fishers to recover in this action any amount for injections of saltwater that reasonably cannot be shown to occupy their pore space. However, the court is not prepared now to rule on what percentage of the historical injections Fishers may be limited to or whether the jury will be permitted to determine the amount, perhaps with some guidance or direction by the court in its instructions.

### G. Continental's argument that this action must be dismissed because of Fishers' failure to produce admissible evidence of an appropriate per-barrel monetary amount

#### 1. Introduction

The court has concluded that Fishers have submitted sufficient evidence to create a jury issue that they have suffered damages recoverable under N.D.C.C. 38-11.1-04 as construed by the North Dakota Supreme Court in <u>Mosser</u>.   Continental argues this was not enough to avoid dismissal pursuant to their motion for summary judgment.   According to Continental, Fishers were obligated to produce admissible evidence of a per-barrel monetary amount that could be used by the jury to make a calculation of damages pursuant to the only damage calculation that they have put forth and they failed to do so.

Fishers disagree, stating  they are prepared to offer at trial evidence of appropriate per-barrel amount(s) from at least three different sources:   (1) Fishers' own testimony; (2) testimony from Lenny Carver; and (3) easement agreements that set forth what the State of North Dakota requires to be paid for injection of saltwater on state trust lands. Continental makes a number of arguments in response, which Fishers, in turn, do not agree with.   These argument and responses are best addressed in the context of the evidence that Fishers appear to rely upon.

#### 2. The "Fisher evidence "

One of the pieces of evidence that Fishers state will be presented at trial to support an appropriate per-barrel amount is their own testimony.  While not necessarily agreeing that it was provided sufficient notice of any such testimony or that it would be admissible,[6] Continental contends that what Fishers were required to do in response to the motion for summary judgment

---

[6] Continental likely has other objections to any Fisher testimony with respect to per-barrel amounts (*e.g.*, lack of personal knowledge and competency) but has not specifically articulated them not knowing what Fishers' testimony might be.

was to offer one or more affidavits setting forth what their testimony would be.

Fishers' response is that they timely made known to Continental they would be offering such testimony and that Continental chose not to depose them.  They argue Continental should not be permitted in this instance to use summary judgment procedures to conduct discovery that should have been done earlier.

While Fishers were not obligated to detail in response to the motion for summary judgment all of their damage evidence, the court concludes Fishers should have tendered something—whether it be affidavit testimony of the Fishers or one of the other pieces of evidence discussed next.   In other words, if the only admissible evidence that Fishers have is their own testimony, then at least some of that should have been detailed in an affidavit in response to the motion.  However, if one of the other pieces of evidence that Fishers have is sufficient to avoid summary judgment of dismissal, Fishers need not have provided affidavits setting forth their testimony.  In that instance, any potential problems with Fishers' testimony would be dealt with at trial or possibly a motion in limine that is not in reality a vehicle to obtain discovery.

### 3.    The "Lenny Carver evidence"

Another source of evidence that Fishers say they will rely upon to prove an appropriate per-barrel amount is testimony from Lenny Carver.  According to Fishers, Carver operates one or more saltwater disposal facilities and is prepared to testify as to per-barrel amounts he pays surface owners for disposal of saltwater.

Continental states that this is not sufficient for the same reason as set forth above with respect to any testimony by Fishers.  That is, the fact his testimony has not been proffered to the court either by way of affidavit or by deposition. Continental also contends that any testimony by Carver would not be admissible at trial because Carver was not timely disclosed as a person having

relevant knowledge.  Continental contends that Carver was first disclosed as a potential witness in a supplemental Fed. R. Evid. 26(a)(1) disclosure served by Fishers on July 8, 2021, the day prior to Continental filing its motion for summary judgment and well after the close of fact discovery.

Fishers do not dispute that Carver was not disclosed as a person having relevant knowledge within the time set for completion of fact discovery.  Rather, Fishers' response is that they only recently become aware of Carver and that some relief should be granted in the interests of justice and because Continental would not be prejudiced if the court permitted Continental to depose Carver.  Fishers  also point to a supplemental Rule 26(a)(1) disclosure made by Continental during the same time frame disclosing what they contend is not previously disclosed evidence.

In addition to untimeliness, Continental has several overarching relevancy objections to any testimony by Carver.  One is that any evidence of what others are paying for disposal of saltwater that is not within the same production unit as the Fisher property is irrelevant.  This is the subject of one of Continental's motions in limine and will be dealt with later.  However, for present purposes, the court does not agree that off-unit, per-barrel amount evidence is *per se* irrelevant.

Continental also believes that most, if not all, of the per-barrel amount evidence that plaintiffs intend to offer was paid under circumstances not sufficiently equivalent to the case at hand and, hence, not relevant.  While this may be a concern, the court is not prepared at this point to rule on lack of equivalency objections and likely will not do so until trial when it can consider the proffered evidence in context of what else is presented.

### 4.     The " State of North Dakota evidence"

Fishers also state they intend to rely upon what the State of North Dakota charges for disposal of saltwater on state-owned lands.  Unlike the Fisher and Carver evidence that plaintiffs say they have, but which is unknown at this point, Fishers have tendered copies of easement agreements

which they contend are evidence that the North Dakota Department of Trust Lands is receiving $.10 per barrel for saltwater injected on state-owned land.

Continental argues this evidence is not admissible for several reasons. One is Continental's contention that a provision in the easement documents stating that the grantee of the easement is not acquiring an interest in the subsurface means that per-barrel amounts being paid pursuant to the easements is not compensation for the injection of the saltwater into the subsurface. This argument is nonstarter. The provision that Continental points to is nothing more than an affirmation that the easement holder cannot claim it is acquiring an ownership interest in the land by virtue of the injections. The same is true in this case. That is, Continental is not obtaining an ownership interest in the Fishers' pore space by virtue of its injections of saltwater.

Continental also objects to the introduction of the State of North Dakota evidence on the grounds that the disposal wells covered by the easements are located off-unit and other lack-of-equivalency. As stated above, the court is not prepared to rule on these relevancy objections now and likely will defer any ruling until trial.

Finally, Continental objects to the court's consideration of the easement documents on the grounds that they have not been properly authenticated. However, it might be a close question whether anything more is reasonably required for at least the documents that have been acknowledged before a notary and that otherwise appear to be legitimate copies. But, even if further authentication is required for technical admissibility, this could easily be cured for purposes of the pending motion for summary judgment by an affidavit from an appropriate official or a certificate of authenticity permitted by Fed. R. Evid. 902(4).[7]

---

[7] It does not appear from the briefing that Continental specifically objected to the State of North Dakota evidence based on the timing of its disclosure. If that is so, one of the reasons may be that Continental was well aware of what the North Dakota Department of Trust Lands has required to be paid for disposal of saltwater on state lands at

5.      **The court will deny this part of Continental's motion for summary without prejudice**

If the court had not postponed the trial, it would have permitted Fishers to obtain and submit to the court a certificate of authenticity of the State of North Dakota evidence. And, if Fishers were able to obtain the certificate, the court would have denied Continental's motion for summary judgment to the extent it seeks to dismiss the action for lack of evidence of damages, even though the court is deferring for now any finally ruling on its relevancy. That is, the State of North Dakota evidence would be sufficient at this stage to avoid summary judgment. Also, if the only evidence that Fishers have is their own testimony, the court would have permitted Fishers to supplement their response to the motion for summary judgment with appropriate affidavits before imposing the "death penalty" of dismissing the case.

With the court's decision to postpone the trial and what the court is ordering below, the landscape has changed. The court suspects that the more technical objections to the State of North Dakota evidence will sort themselves out. Further, Continental will be permitted to depose Fishers. And, with respect to both the State of North Dakota evidence and any Fisher testimony, Continental will have the opportunity to renew its relevancy objections at trial or possibly by a future motion in limine. Hence, the court is going to deny without prejudice that part of Continental's motion for summary judgment in which it seeks to dismiss the case for lack of admissible evidence with respect

---

least in some instances. Notably, similar evidence has been presented to this court in the past. E.g., Raaum Estates v. Murex Petroleum, No. 4:14-cv-024, 2017 WL 2870070, at *23 (July 5, 2017), 2015 WL 5692151, at *5 (D.N.D. Sept. 28, 2015) (defendant oil company offered evidence of what it was paying surface owners for disposal of saltwater, including $.10 per barrel to the State of North Dakota); Mosser v. Denbury, 2016 U.S. Dist. LEXIS 160376, at *26 & n.7 (D.N.D. Nov. 18, 2016) (operator of the unit adjoining the unit in this case proffered copy of salt water disposal agreement with the State of North Dakota pursuant to which the State charged $.10 per barrel of saltwater or $500 per month, whichever is greater, in support of what the State of North Dakota charges). And, while Fishers cannot ask the court to take judicial notice of this evidence for a number of reasons (including the fact the admissibility of that evidence was not challenged in those cases), it does appear this is what the State of North Dakota charges and likely can readily be established by testimony from a relevant state official.

to damages.

### III.   CONTINENTTAL'S MOTIONS IN LIMINE

#### A.   Motions in limine re experts Button and Manes

Continental seeks to exclude the testimony of Button and Manes, who are two of Fishers' experts, on a number of grounds.  The court grants the motion to the extent it is foreclosing Fishers' evidence relevant *only* to their claim of future damages.   The court will also exclude as speculative any testimony in this action by Button that saltwater disposed of on adjoining property will at some point flow back upon Fishers' pore space for the reasons articulated earlier.  As for the remainder of Button's opinions that Continental seeks to exclude, the court will deny the motion without prejudice and Continental can renew its objections to that testimony at trial.

#### B.   Motion in limine to exclude all evidence of off-unit disposal rates

Continental seeks to exclude all evidence that Fishers may present as to what others are charging or receiving for disposal of saltwater that is not within the unit operated by Continental. The court concludes that off-unit disposal rates are not *per se* inadmissible.  However, the court will defer until trial ruling on relevancy objections to any particular pieces of disposal rate evidence that Fishers may offer.  Hence, this motion for limine will be denied.

#### C.   Motion in limine seeking to exclude "mischaracterizations" of Continental and its operations

Continental seeks to prohibit any evidence or argument by Fishers' counsel that Continental contends would mischaracterize it and its operations.  This includes, according to Continental, any evidence or argument that: (1) Continental is a trespasser; (2) Continental is a "big" oil company that is taking advantage of Fishers; and (3) attempts to associate Continental with any environmental event or similar irrelevant acts by other oil companies.

The court agrees that Continental is not a trespasser and grants the motion in limine to that extent.  The court rejects Fishers' counsel's argument that he should be permitted to make arguments about trespass in order to explain to the jury the background of ch. 38-11.1 and the reason for its expansive compensation provisions.  The court will instruct the jury with respect to the rights and obligations of the parties to the extent it may be relevant as well what the law permits in terms of recoverable damages.[8]

As for the remainder, the court will defer any ruling on Fed. R. Evid. 402 and 403 grounds until trial.  However, Fishers' counsel is cautioned that most, if not all, of what Continental seeks to exclude is likely irrelevant since the only claim remaining for trial is for compensation pursuant to § 38-11.1-04 and there being no claim for punitive damages.

**D.      Motion in limine re drilling errors**

Continental seeks to exclude any evidence that, when drilling the 42-17, it impinged upon the layers that confine the formation into which it is permitted to inject saltwater as being irrelevant.  Continental argues this is irrelevant because Fishers have not offered any evidence that have been damaged by the impingements.

The court questions the relevancy of the impingement evidence since Fishers have not offered proof that the confining layers will no longer confine the injected saltwater or that they have otherwise suffered damages proximately resulting from the impingements, *e.g.*, evidence of diminution in value of their property because of a concern that the confining layers have been compromised.  However, the court is not prepared to make a final ruling now.  The court will grant

---

[8]  What is "sauce for the goose" will likely be "sauce for the gander."  While the court makes no ruling now, Continental's counsel will likely not be permitted to offer similar evidence or argument with respect to its rights as unit operator or as possessor of dominant mineral rights if the intended purpose of the evidence or argument is that  Fishers are not entitled to compensation pursuant to § 38-11.1-04 l for these reasons.

the motion to the limited extent that Fishers' counsel shall not be permitted to delve into this area in the presence of the jury without first obtaining a ruling on the admissibility of the evidence.

### E.      Motion in limine re Carver

Continental seeks to exclude any testimony by Lenny Carver on the grounds that he was not timely disclosed as a person having relevant knowledge and on the alternative grounds that his testimony should be prohibited because any per-barrel disposal rates he may testify to are either "off-unit" or are rates for commercial disposal.  With respect to the lack-of-timeliness objection, Continental will not suffer undue prejudice because the court in a revised scheduling order that will be entered after further consultation with the parties will permit Continental to depose Carver.  As for the remaining relevancy objections, the court will defer any ruling until it knows more precisely what Carver will testify to.

## IV.      <u>LIMITED REOPENING OF DISCOVERY AND SCHEDULING</u>

The court is inclined at this point in the interests of justice to reopen discovery but limited primarily (if not exclusively)  to the issue of per-barrel amounts that may be used in proof of damages.[9]  This would include the ability of Fishers to discover and disclose additional evidence and Continental being able to discover and disclose rebuttal evidence.  Also, Continental will be permitted an opportunity to depose Fishers, Carver, and any other persons identified by Fishers as having relevant knowledge.  However, before making a final decision and setting forth specific dates for the completion of additional discovery, the court wants to hear from the parties.

## V.      <u>ORDERS</u>

Based upon the foregoing, the court **ORDERS** as follows:

---

[9] Fishers counsel suggested during the hearing that, if the trial was postponed, he might seek to offer a damage calculation based upon diminution in value of Fisher property.  This would be entirely new tact and one the court likely would not look favorably upon.

1.      Continental's motion for summary judgment (Doc. No. 72) is **granted in part** to the extent that any recovery by Fishers based upon the theory of damages they have chosen will be limited to saltwater injected to the date of trial and **denied in part** as to the remainder consistent with discussion set forth above.

2.      Continental's motions in limine (Doc. Nos. 68 & 70)  seeking to exclude opinions of experts Button and Manes are **granted in part** to the extent the court excludes (1) evidence that is relevant only to damages based upon predicted future injections of saltwater by Continental and (2) opinions by Button relevant only to whether saltwater injected on adjoining property will generally at some point in the future flow back upon Fisher pore space.  The remainder of the motions are **denied in part** without prejudice.

3.      Continental's motion in limine (Doc. No. 93) seeking to categorically exclude all evidence of off-unit saltwater disposal rates is **denied**.

4,      Continental's motion in limine (Doc. No. 91) seeking to exclude certain evidence and argument purportedly mischaracterizing Continental and its operations is **granted in part** to the extent any evidence and argument that Continental is a trespasser are prohibited—at least to the extent that Continental does not somehow open the door.  The remainder of the motion is **denied** without prejudice.

5.      Continental's motion in limine (Doc. No. 95) seeking to exclude evidence of drilling errors resulting in impingement of confining layers is **granted** to the extent that Fishers shall not introduce evidence of these drilling errors or otherwise make mention of them without first seeking permission from the court outside the presence of the jury.

6.     Continental's motion in limine (Doc. No. 87) to exclude testimony from Lenny Carver is **denied** without prejudice.

7.     Fishers shall have until December 31, 2021, to make a formal election to limit this action to recovery for saltwater injected as of the date of trial and reserve the right to bring successive actions for future injections.

8.     The parties individually (or jointly by agreement) shall on or before December 10, 2021, set forth what they propose for additional permissible discovery along with proposed revised  pretrial deadlines for all remaining pretrial activities.  The court will conduct a telephonic hearing on these topics shortly thereafter.

Dated this 29th day of November, 2021.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court