**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Continental Resources, Inc., an Oklahoma corporation, | ) ) ) | |
| Plaintiff, | ) ) ) ) | **ORDER DENYING MOTION FOR JUDGMENT OF DISMISSAL NOTWITHSTANDING THE VERDICT OR FOR NEW TRIAL; ORDER** |
| vs. | ) ) | **AWARDING FEES AND COSTS** |
| Rick Fischer and Rosella Fisher, | ) ) | Case No. 1:18-cv-181 |
| Defendants. | ) | |

Before the court now are two post-trial motions.  The first is a motion by Continental Resources Inc. ("Continental") for judgment of dismissal notwithstanding the jury verdict or, in the alternative, for a new trial.  The second is a motion by defendants Rick and Rosella Fisher (the "Fishers") for attorney fees, expert fees, and costs.

I.      **BACKGROUND**

A.      **Trial evidence supporting the verdict**

What follows is an outline of evidence supporting the verdict.  Unless otherwise indicated, the evidence was not disputed.  Additional evidence, both undisputed and disputed, will be discussed later as relevant.

Continental is an oil and gas exploration and production company.  It  operates numerous wells in western North Dakota.  (Tr. 138–39, 326).

The Fishers are Montana residents.  They own a 575-acre farm in Bowman County, North Dakota located on the following contiguous tracts:

1

<u>Township 131 North, Range 106 West</u>
Section 8:  SW¼
Section 17: N½, NE¼SE¼
Section 18:  NE¼

The Fishers' ownership interest includes the surface estate and a very small portion of the mineral estate.  (Tr. 300, 317, 332–33; Ex. 200).  The Fishers bought the farm in 1982 and actively worked it for several years before putting its acreage into CRP.   One of the Fishers' sons now lives on the property. (Tr. 138–39, 294–95).

The Fishers' farm is located within the Cedar Hills North Red River "B" Unit ("Unit") established by the North Dakota Industrial Commission ("NDIC") in 2001 to unitize oil-and-gas operations within approximately 50,000 acres located in Bowman and Slope Counties in southwestern North Dakota.  Continental is the operator of the Unit.   ( Tr. 303, 324, 328–31 254; Ex. 200).

In 2013, Continental drilled a salt water disposal ("SWD") well on the NE¼ of Section 17, T131, R106W owned by the Fishers.  The well is formally known as the Lonesome Dove 42–17 SWD well and will be referred to herein as the "42-17."  (Tr. 259, 354; Ex. 2).

The formation into which the 42-17 injects saltwater is located  approximately 1½  miles below  the  surface  and  is  known  as  the  Lower  Oolitic  Zone  of  the  Lodgepole  Formation ("Lodgepole").  The Red River "B" formation ("Red River") from which Continental is producing oil and gas is deeper and located below the Lodgepole.  (Tr. 224–26).

The 42-17 is a horizontal well and injects saltwater along the entire length of the horizontal run of its wellbore.  Only about ⅓ of the horizontal portion of the wellbore is on the Fishers' property.  The remaining ⅔ extends into adjoining property owned by third parties.  (Tr. 428–34; Exs. 264, 315).

2

Prior to drilling and operating the 42-17, Continental needed to and did obtain an "aquifer exemption" from the EPA and the NDIC to allow it to dispose of saltwater into the Lodgepole. This is because the water quality in the Lodgepole is sufficient to meet federal drinking-water standards. The aquifer exemption granted by the NDIC is in the form of an order dated May 17, 2013. It allows Continental to inject saltwater into an area of the Lodgepole that is within ¼ mile of its lateral, with the dimensions of the "exempted area" being 4,128 feet in length, 2,640 feet in width, and 85 feet in thickness. In addition to the geographic limit, the aquifer exemption also limits the amount of saltwater that may be disposed of through the 42-17 to 38,813,976 barrels. The volume limitation is an amount calculated by the NDIC based on the volume of the exempted area and the ability of the formation to receive and hold the saltwater, which is dependent upon several factors, including the formation's porosity and reservoir pressures. (Tr. 264–66, 285, 345–51; Exs. 247–48, 250).

Although Continental commenced drilling of the 42-17 in 2013, it did not make its first injection of saltwater until October 2018. Up to the time of trial, Continental had injected 1,339,317 barrels of saltwater using the 42-17. (Tr. 263, 355; Ex. 2).

Continental's expert testified that the injected saltwater is dispersed evenly along the length of the 42-17's horizontal wellbore and that only 33.51% of the horizontal wellbore is on the Fishers' property. (Tr. 434). During final argument, Fishers' counsel stated that his clients were not quibbling with the 33.51% or that the jury could multiply that percentage times the total amount of injected saltwater to determine how much of the injected saltwater uses and occupies their subsurface. (Tr. 502).

There is no evidence that Continental violated the requirement of its aquifer exemption that the injected saltwater not be permitted to migrate outside of the "exempted area." Hence, the jury

could reasonably have concluded that the injected saltwater occupies and uses pore space within the exempted area, which includes a portion of the Fishers' property. And, given the undisputed evidence of the uniform distribution of saltwater along the length of the lateral run, the jury could reasonably have concluded that approximately 33.5% of the injected saltwater occupies and uses the Fishers' subsurface.

## B.    The jury verdict

The jury concluded in an answer to an interrogatory in the verdict form that the Fishers suffered loss of use or access to their property as a result of Continental's operation of the SWD 42-17 up to the time of trial.[1]  It then awarded the Fishers $22,440.25 as compensation. (Doc. No. 191).

While the verdict form did not require the jury to set forth how it calculated its award, clearly the jury decided to award the Fishers $.05 per barrel for the amount of saltwater injected to date that the evidence demonstrated uses and occupies the Fishers' subsurface.  This is because the total amount of saltwater injected up to the time of trial of 1,339,317 barrels times 33.51% equals 448,805.1267 barrels.  And, multiplying that amount times $.05 per barrel equals $22, 440.25---the exact unrounded amount of the jury verdict down to the penny

As discussed later, $.05 per barrel is in the lower range of what the jury could have concluded was the going rate for saltwater disposal in the subsurface based on the record evidence. Notably, it is less than the $.10 per barrel  the State of North Dakota receives for the use of its

---

[1]  In fact, the evidence was such that the court likely would not have erred if it instructed the jury to that effect and limited its consideration to only what amount of compensation should be paid to the Fishers for such use. While Continental did not contend it was not using the Fishers' property, its position was that the Fishers did not suffer any actual loss of use or access to their property and that Continental's other operations enhanced the storage capacity of the Fishers' pore space.  The court will return to these points later.  However, as a preview, there is evidence that the jury could have concluded otherwise.  Moreover, the court's conclusion is that it does not make any difference and that Continental's use of the Fishers' property for disposal of injected saltwater is sufficient to support an award of compensation.

property for saltwater injection and the $.10 per barrel the Fishers requested during the trial.  The $.05 per barrel is within the range of what the jury could have concluded Continental was paying for injected saltwater at other locations.

### C      Additional background

#### 1.      Introduction

It is helpful for purposes of what follows to understand:  (1) why the parties were litigating in this case only what compensation was due for injection of saltwater into the subsurface and not also Continentals use of the surface for the 42-17 and its associated facilities; (2) why the Fishers were limiting their claim for compensation to the amount of saltwater injected as of the time of trial; and (3) why the Fishers were relying upon evidence of what others were paying on a per-barrel basis for injection of saltwater to support their claim for compensation.   To that end, the court will briefly review: (a) the initial action between the parties relating to the 42-17 and the settlement of that action; (b) relevant decisions of the North Dakota Supreme Court; and (c) the earlier rulings in this action limiting the scope of the Fishers' claim for compensation.

#### 2.      The earlier "<u>Fisher</u>" action

Before the 42-17 became operational, the Fishers sued Continental in state court for claims of nuisance, trespass, fraudulent misrepresentation, deceit, and statutory damages under N.D.C.C. § 38–11.1–04.  Continental removed the action to this court, which was  docketed as <u>Fisher v. Continental Resources Inc.</u>, No.1:13-cv-00097 ("<u>Fisher</u>").

 In <u>Fisher</u>, the Fishers contested Continental's claim that it had the right to use their property for saltwater disposal, both as a general matter and as it being an unreasonable exercise of the rights of the dominant mineral interests in this particular instance.  In the alternative, the Fishers claimed

they were entitled to statutory compensation under N.D.C.C. § 38–11.1–04 for the use of their surface acreage as well as the underlying pore space to which they claimed ownership.  Fishers also sought other relief not relevant now.

In opposition, Continental contended it had the right to use the Fishers' property for the 42-17 based on it having acquired an implied easement arising as a consequence of the dominancy of its mineral interest and as unit operator for the other mineral interest owners.  With respect to the Fishers' § 38-11.1-04 claim for damages, Continental agreed it owed money for use of the surface of the Fishers' property but claimed with respect to the subsurface that no money was owed because the Fishers did not own the "pore space." In the alternative, Continental contended N.D.C.C. § 38-11.1-04 did not provide compensation for use of subsurface pore space and, even if it did, there would be no compensable damage.

In a 2014 order in Fisher, this court concluded that Continental had the right as the unit operator to use the Fishers' property for a SWD well but only if the use was reasonable, which the court stated to be a question of fact to be resolved in further proceedings.  At the same time, the court declined to take up the pore space ownership issue but did indicate in a footnote that good arguments existed for concluding that the Fishers, as owners of the surface estate, owned the pore space and that damages could be recovered pursuant to § 38-11.1-04 for use of the pore space. Fisher, 49 F. Supp. 3d 637, 648 n.3 (D.N.D. 2014).

Later, the court did address the pore space ownership issue.  The court concluded the pore space is part of the surface estate and is owned by the Fishers.  The court further concluded that § 38-11.1-04, which allows for the recovery of compensation for damage to or use of the "surface owner's land[,]" extends to the pore space.  Finally, the court concluded it was premature to take up

6

the issue of what compensation would be due since Continental at that point had not begun using

the 42-17.  <u>Fisher</u>, 2015 WL 11400124.

In  May 2016, the Fishers and Continental reached a partial settlement of what was at issue

in <u>Fisher</u> culminating in the execution of a Stipulation to Dismiss ("Stipulation") that stated, in

relevant part, the following:

> Whereas the Fishers have initiated the above-captioned action, alleging, inter alia, claims for lost land value and lost use of and access to their land under Chapter 38-11.1 of the North Dakota Century Code, and have claimed they are entitled to compensation for (1) losses associated with the actual surface of the property where the Lonesome Dove Well site and associated infrastructure is located ("Surface Claims") and for (2) losses associated with the pore space into which produced water could be injected by the Lonesome Dove Well ("Pore Space Claims"); and

> Whereas the Parties wish to avoid the risk, time, expense, and aggravation of litigation with respect to the Surface Claims, and have therefore agreed to resolve all claims that arise from or relate to the use of the actual surface of the Subject Lands for construction of a well pad and related infrastructure, including claims related to any alleged fraudulent misrepresentation, deceit, nuisance or trespass ("Resolved Claims"), but not the claims related to the alleged use of pore space ("Unresolved Claims");

> Now, therefore, the Fishers and Continental stipulate and agree as follows:

> 1. The above-captioned case shall be dismissed with prejudice and without costs to either party with respect to the Resolved Claims.

> 2. The above captioned case shall be dismissed without prejudice and without costs to either party with respect to the Unresolved Claims.

> 3. If Continental begins using the Lonesome Dove Well for production water disposal operations, either party may, at their option, reopen the case for adjudication of the Unresolved Claims by filing an appropriate motion with the Court. Upon being reopened, the case shall continue as if it had not been closed, and the parties shall remain bound by all opinions and orders previously issued by the Court in the above-captioned action.

(<u>Fisher</u>, Doc. No. 88).   The court then dismissed <u>Fisher</u> pursuant to the Stipulation.

### 3.    The North Dakota Supreme Court's 2017 <u>Mosser</u> decision

As discussed in more detail later, the only claim for compensation asserted by the Fishers

in this case is for compensation pursuant to N.D.C.C. § 38-11.1-04 for lost use of  or access to the

pore space underlying their property resulting from the injection of saltwater by Continental. And, the only method of calculating the compensation offered by the Fishers in their pretrial disclosures and permitted at trial is what others are being paid on a per-barrel basis for injected saltwater—a method of calculating compensation for use of the pore space the North Dakota Supreme Court in Mosser v Denbury, 2017 ND 169, 898 N.W.2d 406 (2017) ("Mosser") concluded would be permitted under North Dakota law—at least with respect to past injections.

The North Dakota Supreme Court's decision in Mosser arose out of an action in this court similar to the one now at issue  where the surface owner's claim for compensation pursuant to N.D.C.C. § 38-11.1-04 for a unit operator's use of pore space for injections of saltwater. In that case, the undersigned certified a number of questions to the North Dakota Supreme Court, primarily to address the thorny questions with respect to the scope of  § 38-11.1-04's compensation remedy with respect to use of pore space deep below the surface as well as what may be relevant evidence of compensation. However, believing it unfair to ask the North Dakota Supreme Court to answer questions directed solely to the compensation issues in a vacuum, the undersigned posed two questions directed to the overarching issues the undersigned  had already decided based upon a prediction of what the North Dakota law is. The two issues the court had already resolved were that the surface owner owns the underlying pore space (at least absent a conveyance to a third party) and that damages are recoverable by a surface owner under § 38-11.1-04 for a mineral developer's use of the pore space for disposal of saltwater. Mosser v. Denbury, No. 1:13-cv-148, 2016 U.S. Dist. LEXIS 160376, at **7–22 (D.N.D. Nov. 18, 2016) (request to answer certified questions); Mosser, 2017 ND 169, ¶¶ 14, 18.

The first certified question the undersigned posed in Mosser was:

1. In North Dakota, does the owner of the surface estate own the pore space deep below the surface, absent some conveyance of the pore space to a third party and even when the mineral estate has been severed from the surface estate?

Id. at ¶ 16.  In answering that question, the North Dakota Supreme Court discussed the interplay between § 47-01-12 and the more recently enacted ch. 47-13.  The court stated:

[¶ 16] Chapter 47–31, N.D.C.C., was enacted in 2009 N.D. Sess. Laws ch. 401 in conjunction with provisions for carbon dioxide underground storage in 2009 N.D. Sess. Laws ch. 318. The legislation codifying pore space policy was intended to confirm that surface owners own the pore space under their surface estate. See Hearing on S.B. 2139 Before Senate Natural Resources Comm., 61st N.D. Legis. Sess. (Jan. 16, 2009) (written testimony of Assistant Attorney General Charles Carvell). That testimony is consistent with N.D.C.C. § 47–01–12, N.D.C.C., which dates back to 1877 Civil Code for the Dakota Territory, and states the "owner of land in fee has the right to the surface and to everything permanently situated beneath or above it."

Id..  Following that discussion, the court concluded "the owner of a surface estate owns the underlying pore space absent a conveyance of the pore space to a third party before April 9, 2009." Id. at ¶ 17. It then answered the first question "Yes."

The second certified question the undersigned asked was:

2. If the answer to the first certified question is yes, do the provisions of N.D.C.C. § 38–11.1–04 that require compensation be paid to a surface owner for "lost land value" and "lost use of and access to" a surface owner's land extend to a mineral developer's use of the subsurface pore space for the disposal of saltwater generated as a result of drilling operations?

Id. at ¶ 18.  The North Dakota Supreme Court answered that question as follows:

When the provisions of N.D.C.C. §§ 38–11.1–04, 47–01–04, and 47–01–12 are read together, we agree with the interpretations by the federal magistrate judge and the federal district court that pore space is part of the surface owner's interest in the land for purposes of N.D.C.C. § 38–11.1–04. We conclude a surface owner may be entitled to compensation under N.D.C.C. § 38–11.1–04 for a mineral developer's use of the surface owner's subsurface pore space for disposal of saltwater generated as a result of drilling operations. We answer the second certified question "yes."

Id. at ¶ 24.

The five other questions the undersigned certified were as follows:

3. If the answer to the second certified question is yes, is the ability to recover damages under N.D.C.C. § 38–11.1–04 limited to when the surface owner is currently using the pore space or when there is evidence that the surface owner is likely to make use of the pore space within the reasonably near future, either by personally using it or leasing it to another?

4. Are damages under N.D.C.C. § 38–11.1–04 for a mineral developer's use of subsurface pore space for disposal of saltwater recoverable only if the surface owner can prove a diminution in the market value of the affected property?

5. In order to recover damages for a mineral developer's use of subsurface pore space for the disposal of saltwater under N.D.C.C. § 38–11.1–04, must the surface owner prove some damage other than the mere occupancy or loss of access to the pore space, *e.g.*, an interference with the surface owner's actual use of the pore space or a concrete plan to do so in the reasonably near future or evidence of diminution in the market value of the property affected by the saltwater disposal?

6. Can a surface owner recover damages under N.D.C.C. § 38–11.1–04 for a mineral developer's use of the surface owner's pore space for the disposal of saltwater when the only evidence upon which to calculate damages is (1) proof of what is being paid to other surface owners for the use of their pore space for the disposal of saltwater on a per barrel basis (assuming the third party transactions being relied upon are "arms length" and fairly comparable); and (2) evidence of the number of barrels of injected saltwater that, more likely than not, is occupying the surface owner's pore space?

7. If a surface owner can recover damages under N.D.C.C. § 38–11.1–04 for a mineral developer's use of the surface owner's subsurface pore space based on an amount per barrel for barrels of saltwater injected into the subsurface, can the surface owner in the same action recover additional damages based on an estimate of how may more barrels of saltwater could be injected into the pore space if the surface owner is able to prove, more likely than not: (1) the mineral developer's disposal of saltwater has foreclosed the ability of the surface owner to make use of the remaining capacity in the formulation into which the saltwater is being injected; and (2) the remaining capacity of the formation into which the saltwater is being injected?

Id. at ¶ 25.

The North Dakota Supreme Court responded to these questions stating:

[¶ 27] The federal magistrate judge's order for certification generally described the evidentiary background for the five remaining certified questions:

> In this case, the only evidence of damage that plaintiffs will be offering is evidence that the saltwater being disposed of by Denbury is occupying their pore space and what others are paying to surface owners for subsurface disposal of saltwater. Denbury claims this is not enough to recover under § 38–11.1–04 if it applies. Denbury contends that there must be some evidence that plaintiffs were either using the pore space or, perhaps, had some concrete plans to do so in the near future. Further, even if actual or intended use is not required, Denbury contends that plaintiffs must at the very least proffer some evidence that their property has

diminished in value. According to Denbury, in the absence of plaintiffs being able to prove any of these things (e.g., interference with an actual or intended use or, perhaps, loss of land value), plaintiffs have failed to prove that they have sustained damage within the meaning of the statute and their claim pursuant to § 38– 11.1–04 must be dismissed.

Questions three through six go to whether plaintiffs can recover damages on a per barrel basis for the saltwater that plaintiffs can demonstrate is occupying their pore space based only on evidence of what others are paying surface owners for the disposal of saltwater or whether § 38–11.1–04 requires something more. If those questions are answered in [sic] manner that allows plaintiffs' claim to go forward, then question seven goes to whether plaintiffs can also recover for pore space that Denbury has not yet utilized if plaintiffs can convince the factfinder that Denbury's disposal of saltwater has foreclosed their future use of that pore space.

[¶ 28] We consider these five certified questions based on the federal magistrate judge's explanation of the evidence and statement that questions three through six, in particular, will have to be addressed in some fashion in Denbury's pending motion for summary judgment. On this record, we conclude the answers to questions three through six may be determinative of this action and there is no controlling precedent on those issues in the decisions of this Court. See N.D.R.App.P. 47.

[¶ 29] The plain language of N.D.C.C. § 38–11.1–04 requires a mineral developer to pay a surface owner a sum of money equal to the amount of damages sustained by the surface owner for lost land value, lost use of and access to the surface owner's land, and lost value of improvements caused by drilling operations. The plain language of that statute is not limited to whether the owner of a surface estate is currently using or planning to use the pore space in the near future. Rather, the statutory language requires the mineral developer to pay the surface owner for "lost land value, lost use of and access to the surface owner's land, and lost value of improvements." That language is not limited to a diminution in market value of the owner of the surface estate's interest and includes a surface owner's lost use of and access to a surface owner's pore space at some time in the future regardless of the surface owner's current use or future plan for use of the pore space.  That interpretation is consistent with the legislature's stated purpose for N.D.C.C. ch. 38–11.1 "to provide the maximum amount of constitutionally permissible protection to surface owners and other persons from the undesirable effects of development of minerals" and the legislature's separate rule of construction that N.D.C.C. § 38–11.1–04 "must be interpreted to benefit surface owners." N.D.C.C. § 38–11.1–02.

[¶ 30] Moreover, the plain language of N.D.C.C. § 38–11.1–04 does not preclude a surface owner from recovering what others may be paying to dispose of saltwater in pore space; rather, the price per barrel others are paying for saltwater disposal may provide some probative evidence of the amount a surface owner may be damaged for "lost use of and access to the surface owner's land" under N.D.C.C. § 38–11.1–04. We do not speculate on the extent of the evidence a surface owner may proffer to establish lost use of and access to a surface owner's land, because the probative effect and admissibility of proffered evidence is a matter for a trial court's discretion.  See F.R.Ev. 401–403 and N.D.R.Ev. 401–403. Rather, for purposes of these certified questions, we conclude certified questions 3 through 6 may be determinative of this action and answer "no" to questions 3 through 5 and "yes"

11

to question 6.

[¶ 31] In formulating question 7, however, the federal district court said it anticipated the plaintiffs will offer evidence that Denbury's saltwater disposal has foreclosed their ability to use or otherwise access the remaining pore space under their surface estate. The court's explanation indicates question 7 is based on Denbury's anticipated future conduct as well as potential regulatory or physical barriers to accessing any remaining pore space, none of which is certain to occur. We decline to speculate on what evidence might be used to show foreclosed access to remaining pore space, and we decline to answer question.

Id. at ¶¶ 27–31.

### 4.    Continental files this action upon commencing to use the 42-17 to dispose of saltwater  and the court's rulings on the initial cross-motions for summary judgment

On September 9, 2018, Continental commenced the present action on the eve of beginning to operate the 42-17 to inject saltwater into the subsurface.  Continental sought a declaration that the Fishers would not suffer compensable damages resulting from its injection of the saltwater.  In addition, Continental also sought a declaration that its use of the 42-17 would be a reasonable exercise of its dominant mineral interests—an issue held open in Fisher.  (Doc No. 1).

The Fishers answered Continental's complaint contending that Continental was not entitled to the relief it requested, including claiming that Continental's use of their property was not a reasonable exercise of the rights of the dominant mineral interests.  In addition, the Fishers asserted a counterclaim for compensation for Continental's use of their pore space for injection of saltwater pursuant to N.D.C.C.  § 38-11.1-04.  (Doc. No. 5).

Following the commencement of this action, the North Dakota Legislature in April 2019 passed Senate Bill 2344 ("SB 2344") that amended N.D.C.C. chs. 38-08, 38-11, and 47-31.  Among other things, the 2019 amendments would eliminate the ability of surface owners to recover compensation for use of the pore space under § 38-11.1-04—at least as of the effective date of the law, which this court understood to be August 1, 2019.  Even though Continental had commenced

injecting saltwater through the 42-17 prior to the passage of SB 2344, the newly enacted law had the potential for severely limiting Fishers' claim for compensation. This was because the amount of saltwater injected up to the time of the effective date of SB 2344 was small.

In early 2021, a state district court concluded that SB 2344 was unconstitutional in its entirety and enjoined its enforcement. Northwest Landowners Ass'n v. State of North Dakota, No. 05-cv-00085 (N.D. Dist. Ct., N.E. Jud. Dist., Memorandum Opinion Jan. 21, 2021) (Benson, Swain D.J.). This ruling was appealed to the North Dakota Supreme Court. Continental was a party to that appeal as an intervenor-defendant. Id.

Shortly after the state district court's decision, the undersigned addressed pending motions by Continental for summary judgment and by the Fishers for partial summary judgment. In ruling on the motions, the court rejected Continental's argument that the North Dakota Supreme Court's decision in Mosser—that the owner of the surface estate also owns the subsurface—did not apply when there had been a prior severance of the mineral interest. Also, absent something more, the undersigned stated the court would follow the state district court's decision in response to an argument by Continental that it would owe nothing for saltwater injected after the effective date of SB 2344. Finally, the court dismissed Fishers' claim that Continental's use of their property was not a reasonable exercise of the implied easement of the dominant mineral interest holders. Continental Resources, Inc. v. Fisher, No. 1:18-cv-181, 2021 WL 665102 (D.N.D. Feb. 19, 2021) ("Continental Resources").

### 5.    The court's ruling on Continental's second motion for summary judgment and various motions in limine

In November 2021, following the court's postponement of the initially scheduled trial because the Supreme Court had not yet decided Northwest Landowners, the court ruled on

Continental's second motion for summary judgment as well a number of its motions in limine.  The

court rejected Continental's second motion for summary judgment for reasons that will not be

rehashed here.  Continental Resources, 2021 WL 5567303 (D.N.D. Nov. 29, 2021).  However, what

will be discussed are several rulings limiting the Fishers' claim for compensation that are relevant

to what follows.

Up to the point of the court's November 2021 rulings, the Fishers were seeking

compensation for Continental's use of their subsurface based on per-barrel amounts of saltwater

injected as of the date of trial as well as for potential future injections.  One of the Fishers' experts

(Mr. Button) provided five estimates of amounts of saltwater Continental might inject on a yearly

basis over the next decade or so and labeled the estimates as follows:  "low side;"  "low-side

expected;"  "expected;"  "high-side expected;" and "max."  The "max" estimate was based on future

injections reaching a total of 38,813,976 barrels of saltwater, which is the limit set forth in

Continental's aquifer exemption. The "low-side" estimate assumed that Continental's then low rate

of injection continued for some period and then declined at a 4% exponential rate.  (Doc. No. 69-3).

Another Fisher expert (Mr. Manes) then prepared a table that set forth potential amounts that would

be due the Fishers for future injections that varied depending upon which of Button's forecasted

amounts is used and what potential per-barrel amounts of compensation the jury might award that

ranged from $.05 to $.12 per barrel.    In setting forth the potential amounts due, the expert

discounted the possible streams of future income  to present value.  (Doc. No. 71-3).  The amounts

set fort in the table ranged from $155,000 on the "low side" at $.05. per barrel to $2,856,000 using

the "max" estimate and $.12 per barrel.  Continental Resources, 2021 WL 5567303, **11–12.

The court concluded the Fishers' claim for compensation based upon future injections was

too speculative under North Dakota law.  However, the court also concluded that North Dakota law would permit the Fishers to elect to limit their claim for compensation in this action for the saltwater injected up to the time of trial and bring successive actions for future injections.  Id. at **11-14.

The court also limited Fishers' claim for compensation in another significant way.   The court concluded Fishers would only be able to recover on a per-barrel basis for the amount of injected saltwater the evidence would support occupies and uses the Fishers' subsurface and not those amounts that likely would occupy and use the subsurface owned by adjoining landowners. At that point, the evidence before the court suggested Fishers's claim for compensation would be limited to approximately ⅓ of the injected saltwater given that only approximately ⅓ of the horizontal wellbore of the 42-17 traverses the Fishers' subsurface.  Id. at **14–15.

> **6.      Fishers' election to limit their claim to amounts of saltwater injected to the date of trial and the North Dakota Supreme Court's 2022 <u>Northwest Landowners</u> decision**

Following the court's November 2021 rulings, the Fishers formally elected to limit their claim for damages to the amount of saltwater injected as of the date of the trial.  (Doc. No. 120). Also, the North Dakota Supreme Court concluded in August 2022, shortly before the rescheduled trial, that the portions of SB 2344 that had the potential for limiting Fishers' claim for compensation were unconstitutional.  Northwest Landowners Ass'n v. State, 2022 ND 150, 978 N.W.2d 679 ("Northwest Landowners").

## II.      CONTINENTAL'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR FOR A NEW TRIAL

### A.      Continental's argument that the evidence was insufficient to support the verdict

Continental contends the evidence presented at trial was insufficient to support a conclusion of liability for an award of compensation pursuant to N.D.C.C. § 38-11.1-04.  Continental's primary

argument is that the evidence does not support a finding that the Fishers suffered any actual loss of use or access to the pore space in the subsurface of their property. In fact, according to Continental, its other operations have enhanced the ability of the Fishers to use the pore space underlying their property if they chose to do so. The court rejects Continental's arguments on two levels.

### 1.     The evidence that Continental was using and occupying the Fishers' pore space was sufficient to support the verdict

The undersigned believes the North Dakota Supreme Court would conclude in this instance that evidence demonstrating Continental's use and occupancy of pore space within the Fishers' subsurface is sufficient to support an award of compensation for lost use or access to the pore space without anything more needing to be proved. In no particular order, the following are the reasons why.

*First*, in considering the application of the relevant statutory language to the complex situation presented by a mineral developer's use of the subsurface pore space, the court in <u>Mosser</u> stated:

> We conclude a surface owner may be entitled to compensation under N.D.C.C. § 38–11.1–04 for a mineral developer's use of the surface owner's subsurface pore space for disposal of saltwater generated as a result of drilling operations.

<u>Mosser</u>, 2017 ND 169, ¶ 24. Then, in <u>Northwest Landowners</u>, the court several times referred to what it characterized as the surface owner's right to compensation for the "use of" their pore space for saltwater disposal and storage. <u>Northwest Landowners</u>, 2022 ND 150, ¶¶ 20, 27, 35.

*Second*, the North Dakota Supreme Court would likely conclude that construing the relevant language to require the degree of proof Continental claims is necessary places an undue burden on the surface owner seeking compensation. This point will be revisited after the court rules on the Fishers' requests for fees and costs.

16

*Third*, and related to the second point, is the North Dakota Supreme Court's statements regarding the need to construe and apply the relevant statutory liberally and  in a manner consistent with its purpose, which is to ameliorate what was perceived to be the inequitable results of strict application of the principle of the dominancy of the mineral estate and provide compensation to the owner of the surface estate for use and occupancy of the surface owners' lands.  Northwest Landowners, 2022 ND 150, ¶ 20; Mosser, 2017 ND 169, ¶¶ 13, 21.

*Fourth*, this result is also consistent with the North Dakota Supreme Court's observation that Continental's use of the Fishers' subsurface eliminates the "right to exclude[,]" which is an attribute of Fishers' use and occupancy and which they would have enjoyed but for Continental's exercise of the implied easement accruing to mineral interest holders.  See Northwest Landowners, 2022 ND 150, ¶ 27.  Keep in mind, this conclusion does not do away with the implied easement in that surface property owners cannot not prohibit the use of their property for saltwater disposal provided the use is reasonable.  Rather, it simply allows compensation for that interference on par with what would be paid by a mineral developer in the absence of an implied easement.

As already outlined, the evidence is more than sufficient to support the conclusion that a percentage of the saltwater injected by Continental uses and occupies a portion of Fishers' subsurface.[2]

Hence, Continental's motion for judgement notwithstanding the verdict fails for this reason alone.

### 2.    The evidence was otherwise sufficient

Even if the undersigned is wrong in the conclusion reached above, there is evidence

---

[2]  In fact, given that no reasonable juror could have concluded otherwise,  what the court probably should have done was not ask the first interrogatory set forth in the verdict form and/or more clearly instructed the jury.  However, any error in that regard did not prejudice Continental.

supporting the jury's conclusion that Continental's use otherwise impaired the Fishers' potential use or access. This includes the evidence relating to the aquifer exemption, which prohibits the injected saltwater from migrating beyond the boundary of the exempted area and also limits the volume of injected saltwater. (Tr. 264–66, 285, 345–51; Exs. 247–48, 250). From this evidence, the jury could conclude that the saltwater injected into Fishers' subsurface uses and occupies a portion of the pore space and overtime with further injections diminishes the capacity of the pore space to support more.[3]

The record evidence Continental relies upon for their being no impairment is based upon withdrawals of water from other parts of the same formation, which Continental is not obligated to continue making. (Tr. 438–42). Also, to the extent Continental evidence suggests the impact of initial injections may border upon being *de minimis* as a practical matter, what its evidence did not address was the impact of continuing injections over time.[4]

Separate and apart from this, there is the permit obtained by Continental for the injection of the saltwater into the exempted area. Continental claimed during trial that the Fishers did not lose use of or access to the pore space utilized by Continental because they were free to drill their own injection well and inject fluids or gas into the same pore space. However, the opinions that the Fishers were free to do so were conditioned upon Fishers obtaining the requisite approvals (Tr.

---

[3] In reaching this conclusion, the jury could also have relied upon the evidence with respect to the Lonesome Dove 121, which is one of the other saltwater disposal wells that Continental operated approximately a mile away. The reason offered by a Continental witness as to why Continental simply did not drill another disposal well at that location instead of on the Fishers' property was because Lonesome Dove 121 well was at or reaching the volume limitations imposed by its permit. (Tr. 451–52).

[4] Also, care must be taken in considering certain of the testimony that Continental relied upon to the extent it refers to the impacts to the Fishers' pore space generally and not specifically to the exempted area used and occupied by the injected saltwater.

279–81).  Also, as discussed next, the opinions did not address the *degree* to which the Fishers would be able to inject fluids or gas into the same pore space.

At bottom, whether the Fishers would be able to obtain the requisite approvals for injections within the same exempted area covered by Continental's permit is in part a question of law.  And here, Continental has not pointed to any EPA and NDIC regulations or prior decisions allowing a party to inject fluids or gases within an exempted area that is covered by a permit issued to another party and the court has found none.

The court is skeptical that the NDIC would grant  permission if the party already possessing the permit objects and has already, like Continental here, invested millions of dollars to utilize the capacity allowed by the permit.[5]  But, even if permissions is granted, the court concludes the NDIC and/or the EPA would limit the Fishers' use by at least by the volumes  already injected by Continental if not also by any volumes Continental was then projecting on injecting pursuant to its permit.

Finally, even putting that aside, Continental's permitted use and the uncertainty it creates is an "interference" with potential use by the Fishers.  See Northwest Landowners, 2022 ND 150, ¶ 20; Mosser, 2017 ND 169, ¶ 21. Moreover, as already discussed, Continental's permitted use eliminates an attribute of the Fishers' use and occupancy, which is "the right to exclude[.]" Northwest Landowners, 2022 ND 150, ¶ 27.

### B.    Continental's argument that no competent evidence from which a reasonable juror could make an award of compensation was presented

Continental contends the court erred in (1) allowing the testimony by  Mr. Fisher with

---

[5]  While not dispositive, Continental did not during the trial state it would *not* object to Fishers (or another entity contracting with them) operating a disposal well next door to the 42-17 and injecting saltwater into the same exempted area covered by its approvals from EPA and the NDIC.

respect to what amount per barrel he believed would be fair rental  for Continental's use and occupancy of the Fishers' subsurface for disposal of saltwater and allowing into evidence agreements that contained provisions for payment on a per-barrel basis for injection of saltwater. The latter included agreements  between the State of North Dakota and third parties (the "State agreements") and agreements between Continental and third parties (the "Continental agreements"). If all of this evidence was excluded, Continental contends there would be no evidence to support the amount the jury award.  The court, however, disagrees that it erred admitting the evidence and will start first with the State and Continental agreements.[6]

### 1.     The State and Continental Agreements

Continental makes several arguments for why its own and the State Agreements were not relevant evidence in this instance.  These include its contentions that none of the agreements specifically reference pore space, the agreements all stated that the provisions for a  fixed payment and then a  per-barrel amounts were consideration for use of both the surface and the subsurface, the disposal wells that are the subject of the agreements were not in a unitized field (with one possible exception), and the disparity between Fishers' property and those covered by the other agreements in terms of the amount of surface acreage, size and number of facilities constructed on the surface, and the amount of likely disruption to adjoining acreage in terms of traffic.

The court disagrees.  Beginning with the State agreements, it was clear from the testimony

---

[6] Continental argues that, if the court erred in allowing the jury to consider the agreements that were introduced, there was insufficient evidence to support an award and that a judgment notwithstanding the verdict is the only appropriate relief.  The undersigned disagrees.  As explained in what comes next, there is the testimony of the State witness that the State of North Dakota required in most instances payment of $.10 per barrel for the injection of saltwater into its subsurface, subject to a monthly minimum, regardless of the other circumstances.  This alone would be sufficient to support an award.  If the undersigned concluded there was error in admitting actual agreements to Continental's prejudice, the relief it would have awarded would have been a new trial and not a remand for entry of a judgment of dismissal with prejudice.

of the State witness that its policy was to require (1) payment of $.10 per barrel for saltwater disposal and storage (but not less than $500 per month)—regardless of the points of difference articulated by Continental, including whether or not the well was within a unitized field—and (2) a fixed ("location") payment that varied depending on surface usage.   (Tr. 188–92).  In addition, the State witness testified that its goal of requiring $.10 per barrel was to obtain what was being paid by others for saltwater disposal and that it had conducted a survey to determine what was a fair market rate.  (Tr.186, 189–90).  The State agreements that were introduced into evidence were consistent with this testimony. (Exs. 7–22, 24).  That is, despite the differences between the various agreement in what might be the surface acreage, geographic location, the size of the fixed payment, or other points, the agreements almost uniformly required payment of $.10 per barrel for injected saltwater, with a $500 per month minimum, and then varying fixed amounts.

With respect to the Continental's agreements, Continental's witness claimed that each agreement it entered into was *sui generis* and that any per-barrel amounts paid for injected saltwater were simply part of the total consideration for use of the surface.  And, while Continental's witness in her video deposition played at trial and during her live trial testimony danced around whether *any* of the consideration paid was for use of the subsurface, it was clear that it was at least in part for injection into and disposal of saltwater in the subsurface.  And here, the jury could have concluded from the number of the Continental agreements that there was a discernable pattern.  That is, despite the differences between the fixed payments (which the jury could conclude reflected differences in acreage and the extent of surface usage), there was a consistent pattern of Continental or the initial mineral developer having agreed to pay per-barrel amounts that fell within a range of $.05 to $.06

21

cents per barrel,[7] with most of the more recent being for $.06 per barrel.  (Exs. 84, 85, 91, 93, 97, 101, 104, 108, 112).[8]

Finally, any error by the court in admitting the Continental agreements appears to have been harmless in light of the evidence of what the State was requiring as compensation and the State

---

[7]  There was also a discernable pattern in the amount in the fixed amounts that varied based upon the amount of surface acreage.  In most of the more recent agreements, the fixed payment was in the range of $5,000 to $6,000 per acre.

[8]  Continental argues that the evidence the court permitted of what others were paying on a per-barrel basis for disposal of saltwater was not relevant because all of the agreements (except, perhaps, one) were not in a unitized field. Continental argues that it has  greater rights in terms of being able to force the surface owners to accept the disposal of the water in unitized fields.  Hence, according to Continental, any comparison between amounts paid for saltwater disposal in unitized fields as opposed to elsewhere where the mineral developer cannot require the property to be used for saltwater disposal is like comparing apples to oranges.

The court disagrees.  As discussed above, the evidence with respect to the State is that it was requiring payment of $.10 per barrel regardless of the circumstances, including whether the well was in a unitized field or not.  Also, with respect to both the State evidence and the Continental agreements, there is another more fundamental reason for the court's disagreement that whether the well is in a unitized field (or whether the mineral developer otherwise has an implied easement) is not a foundational requirement for considering the evidence.  As already explained, the statutory goal is allow surface owners to recover compensation on the same basis as if there had been no implied easement.  In fact, what parties agree to as appropriate compensation for injection of saltwater when under no compulsion one way or the other is theoretically more probative of fair market value.  Cf., e.g., Evans v. United States, 326 F .2d 827, 831 (8th Cir.1964); Nuveen v. Nuveen, 2011 ND 44, ¶ 7, 795 N.W.2d 308 (N.D. 2011); Mike Golden, Inc. v. Tenneco, Oil Co., 450 N.W.2d 716, 719–720 (N.D.1990).

Continental also contended the agreements were not relevant because, by their terms, the per-barrel compensation was stated to be part of the total consideration for use of the surface and for injection of saltwater.  The court agrees with Continental that contractually the consideration agreed to by the parties in the agreements was for use of both the surface and the injection of saltwater.  In fact, the court was prepared to so instruct the jury but neither party wanted the court to do so.  (Tr. 86–92).  However, the fact the agreements were structured so that contractually all of the consideration to be paid was for all of the rights being acquired is hardly surprising.  In the undersigned's experience (both judicially and as a private practitioner having drafted numerous agreements), this would be the norm for most agreements—even in other contexts.  The fact the contracts were so structured, however, does not eliminate the reality that the agreement to pay per-barrel amounts is for the ability to inject and dispose of saltwater into the subsurface. Certainly, this was the case with the State of North Dakota agreements as made clear by the State's witness.  Also,  the jury could have reasonably concluded the same was true for the Continental agreements, particularly when considering the pattern of what was agreed to in those agreements.

Moreover, without objection by either party, the court instructed the jury that the parties had settled the dispute over the appropriate compensation for Continental's use of the surface for $40,000.  And, during trial Continental presented evidence comparing the acreage and surface uses of the injection wells that were the subject of the Continental agreements to what was the situation with respect to the 42-17 along with testimony that what it paid the Fishers for the use of their surface was more.  (Tr. 343–45, 369–70, 387–400).  In awarding compensation that amounted to $.05 on a per-barrel basis and not the $.10 required by the State or even the $.06 per barrel provided for in most of the Continental agreements, the jury might very well have considered Continental's contention that it was overly generous in what it paid for the surface and adjusted the award accordingly.  If allowing the jury to consider the amount paid for the surface use was error or contrary to the stipulation entered into by the parties in settlement of the surface compensation, it was to the detriment of the Fishers—not Continental.

agreements.  In fact, given the jury's apparent award of $.05 per barrel, Continental appears to have benefitted form the admission of its agreements over its objections.

### 2.    Mr. Fisher's testimony

Continental argues the court erred in allowing Mr. Fisher to testify that he believed that appropriate compensation on a rental basis for the injection of saltwater into the subsurface of the property he and his spouse owned was $.10 per barrel.  Continental contends there was insufficient foundation for Mr. Fisher's testimony because he had never before entered into a comparable agreement and it was otherwise beyond the scope of what a landowner may testify about.  In support, Continental cites in part to this court's decision in <u>Tank v. Petro-Hunt, LLC</u>, No. 1:16-cv-366, 2018 WL 504402 (D.N.D. Jan. 22, 2018) ) ("<u>Tank</u>")—a decision the undersigned, as its author, is well familiar with.

The court disagrees. In <u>Tank</u>, the court limited the  landowner's testimony in support of his opinion of fair rental value to transactions he was familiar with outside of the litigation context. Here Mr. Fisher did not testify about other transactions to support his testimony.

As for Continental's foundation objection, Mr. Fisher is a longtime owner of the property and very familiar with it.  In this instance his limited testimony fell within what the Eighth Circuit and the North Dakota Supreme Court have permitted landowners to testify about in analogous cases. <u>See</u>, <u>e.g.</u>, <u>United States v. 3,698.63 Acres of Land Situate In  Burleigh, Emmons, and Morton Counties, State of North Dakota</u>, 416 F.2d 65, 67–68 (8th Cir. 1969) (opinion testimony of landowners has been admitted in federal and North Dakota courts in condemnation cases based on a presumption of special knowledge arising out of ownership).

But, even if the court erred in allowing Mr. Fisher's  testimony, it is clear the jury gave it no

weight and any error harmless.  This is because the jury award on a per-barrel basis was one half of what Mr. Fisher testified he believed to be appropriate.[9]

### III.   FISHERS' MOTION FOR ATTORNEY FEES AND COSTS

#### A.   Introduction

The Fishers move the court for an award of $358,480.00 in attorney fees and $133,477.42 for expert fees and costs for a total of $491.957.42.

In response, Continental does not dispute the court is empowered to award attorney and expert fees under state law in this instance if the Fishers prevail.[10]   Rather, Continental argues no award should be made because it is entitled to a judgment of dismissal notwithstanding the jury verdict or for a new trial.  However, the court is denying that motion.  In the alternative, Continental argues that the Fishers' requests for attorney and expert fees need to be substantially reduced.  It is this alternative argument that will be the focus of what follows.

#### B.   The Fishers's attorney fee request and Continental's objections

The Fishers and Continental both agree that the approach the court should take in considering the Fishers' request for attorney fees is the "lodestar" approach that the court in <u>Deadwood Canyon Ranch, LLP v. Fid. Expl. & Prod. Co.</u> No. 4:10-cv-81, 2014 WL 11531553, (D.N.D. June 26, 2014) ("<u>Deadwood Canyon</u>") concluded was appropriate for a statutory claim pursuant to N.D.C.C.  § 38–11.1–04.  The court discussed in <u>Deadwood Canyon</u> what the "lodestar" approach entails and

---

[9] In essence, without an articulation by Fisher of the basis for his request, his testimony amounted to little more than a statement of what he and his wife were seeking and a "definite statement of the maximum figure in contention." <u>Equitrans, L.P. v. 0.56 Acres More or Less of Permanent Easement Located in Marion County</u>, No. 1:25-cv-106, 2016 WL 3996222 (N.D. W. Va. July 22, 2016) (internal quotations and quoting authority omitted).

[10] Most likely the reason is a recognition it would not have prevailed if it argued to the contrary given the court's decision in <u>Deadwood Canyon</u>.

that discussion will not be repeated.

Continental contends in this case that many of the work hours used in the Fishers' lodestar calculation should be excluded because the hours were excessive, redundant, or otherwise unnecessary. More particularly Continental contends:

The court should exclude from the initial fee calculation under the lodestar method any hours that were not ¡§reasonably expended,¡¨ such as ¡§excessive, redundant, or otherwise "unnecessary" man-hours. Deadwood, 2014 WL 11531553 at *2 (citing Hensley, 461 U.S. 424 at 434); A.J. ex rel. L.B. v. Kierst, 56 F.3d 849, 864 (8th Cir. 1995). The Fishers seek recovery of fees expended by six attorneys, two paralegals, four law clerks, and one legal assistant totaling 1,344.70 man-hours. [Dkt. 196-2]. The invoices for their time reflect numerous entries of duplicative, redundant or excessive work, including, but not limited to:

- duplicative work, including internal conferences involving multiple attorneys [E.g., Dkt. 196-6 at 7/9/19, 9/24/19, 10/8/19, 12/29/19, 3/4/20, 7/21/20, 8/11/20, 8/12/20, 8/14/20, 8/18/20, 8/24/20, 8/26/20, 9/9/20, 9/10/20, 9/15/20, 9/16/20, 9/17/20, 9/21/20, 9/25/20, 9/28/20, 10/1/20, 10/13/20, 10/21/20, 10/30/20, 11/10/20, 11/18/20, 1/26/21, 2/3/21, 2/5/21, 2/10/21, 2/12/21, 2/16/21, 3/1/21, 3/3/21, 5/19/21, 6/23/21, 6/24/21, 6/28/21, 7/8/21, 7/13/21, 7/19/21, 7/26/21, 7/29/21, 7/30/21, 8/9/21, 3/9/22, 3/15/22, 3/17/22, 3/18/22, 3/21/22, 3/23/22, 3/29/22, 3/30/22, 4/1/22, 4/5/22, 4/6/22, 4/7/22, 4/8/22, 4/12/22, 4/13/22, 4/15/22, 5/16/22, 5/31/22, 6/9/22, 6/15/22, 7/25/22, 8/30/22, 9/6/22, and 9/16/22];

- excessive or unnecessary time [E.g., id. at 8/9/20, 1/29/21, 4/19/21, 7/26/21, and 7/28/21];

- time spent on needless arguments or motions never filed [E.g., id. at 9/30/19 (stay), 10/2/19 (abstention), 10/23/19 (stay), 11/13/19 (abstention), 11/26/19 (abstention and stay), 11/27/19 (abstention and stay), 12/16/19 (stay), 12/17/19 (stay), 12/29/19 (stay), 12/30/19 (stay), and 1/29/20 (stay)];

- time spent engaging or working with Gary Hughes and John Manes, completely unnecessary experts who, as set forth below, offered nothing of value to the case [E.g., id. at 2/24/20 (Manes), 2/25/20 (Manes), 3/4/20 (Manes), 11/10/20 (Manes), 1/26/21 (Manes), 1/29/21 (Manes), 2/2/21 (Manes), 2/3/21 (Manes), 2/8/21 (Hughes), 2/10/21 (Manes), 2/12/21 (Hughes), 2/16/21 (Hughes), 2/23/21 (Manes), 2/25/21 (Manes), 2/26/21 (Manes and Hughes), 2/27/21 (Hughes), 2/28/21 (Manes), 3/1/21 (Manes), 3/16/21 (Hughes), 3/18/21 (Hughes), 3/23/21 (Manes), 3/30/21 (Hughes), 4/2/21 (Manes), 5/6/21 (Hughes and Manes), 6/16/21 (Hughes), 6/18/21 (Hughes and Manes), 6/23/21 (Hughes), and 6/24/21 (Manes)];

- time spent by Ms. Andersen at trial, who did not appear to play any role in the proceedings [E.g., id. at 10/4/22, 10/5/22, 10/6/22, and 10/7/22]; and,

- excessive time spent seeking to recover fees [*E.g.*, *id.* at 10/14/22, 10/17/22, 10/18/22, and 10/19/22].

As an alternative to considering individual time entries, Continental argues a 50% reduction across the board to all of the requested fees would be appropriate for the time spent that it contends was unreasonable.

Continental further contends that the resulting lodestar (whether determined by evaluation of the individual time entries or employing its suggested 50% across-the-board reduction should be reduced by 25% because of what it contends is the Fishers' limited success. Continental points to the jury award of $22,440.25 and claims this was less than 1% of what the Fishers were initially requesting based in substantial part on their claim for compensation for future injections that the court rejected.

Finally, Continental contends that any attorney fee award should not be more than $89,620, which would be the result of employing a 50% across-the-board reduction for time claimed to be unreasonable and an additional 25% reduction because of limited success. In other words Continental contends that the court should award only 25% of the Fishers' requested fees.

In response, the Fishers dispute Continental's claims that the time spent on the case was excessive, redundant, or unnecessary given the nature of the case. They argue the 1,344.7 work hours are less than what was spent by either party in Deadwood Canyon and that this case was more complicated.[11] They also argue that it is not unusual for multiple attorneys to be involved in a case and point to Continental's use of multiple attorneys, including having at least three attorneys in

---

[11] The undersigned disagrees with the contention that this case was more complicated than Deadwood Canyon. The undersigned is intimately familiar with Deadwood Canyon having been the referred magistrate judge for that case and having conducted at least one settlement conference. While Deadwood Canyon did not involved the complexities of subsurface use, there were other elements of the case that made it more complex.

attendance for the entirety of the trial and one attorney for portions of it, which was in addition to paralegal and other support staff.  Finally, the Fishers point to the fact that they have limited their request to recovery of the lodestar amount and have not sought an enhancement.  Implicit in this statement is that the court provide for enhancement.  Also, in their opening brief, the Fishers pointed to the complexity of the case and the fact Continental did not prevail on it claim for declaratory relief that no amount of money was owed to the Fishers for subsurface use.

### C.    The Fishers' claim for expert fees and costs and Continental's objections

The Fishers seek an award for expert fees and costs totaling $133,477.42.  The expert fees are for three experts: Mr. Button (reservoir engineer); Mr. Hughes (petroleum geologist); and Mr. Manes (engineer and mineral valuation expert).   The costs claimed by the Fishers include witness fees, process-server fees, deposition transcript costs, and other costs incurred in procuring evidence.

Continental disputes only the expert witness fees and then only to the extent of arguing that certain of the expert fees were unnecessary.  Continental states it is not challenging the other claimed costs.

More particularly, Continental argues that all of the fees for Mr. Manes should be excluded because his work related only to the Fishers' calculation of compensations for future injections that the court excluded.  Continental likewise argues that fees for Mr. Hughes should be excluded because a portion of his work also was in support of the Fishers' claim  for compensation for future injections and the remainder was an analysis of the operative geology of the Lodgepole Formation that Continental claims was not required.  Finally, with respect to Mr. Button, Continental agrees it was reasonable for the Fishers to have employed a reservoir engineer but contends that portions of his opinions also related to the Fishers' claim for \compensation for future injects and an

additional opinion the court did not permit to be given at trial. For these reasons, Continental contends that only 50% of Mr. Button's fees should be allowed. With these adjustments, Continental contends that any award made by the court for expert fees should be no more than $56,917.13.

In response, the Fishers argue against any reduction in expert fees for work supporting their claim for compensation for future injections, including Mr. Manes who was not called at trial. The Fishers argue their future loss evidence only became irrelevant following the court's rulings that limited their claim for compensation to injections made up to the time of trial, but coupled with the court's conclusion the Fishers would be able to bring successive claims for future injections that result in use or occupancy of their pore space. The Fishers contend that, prior to the court's rulings, the employment of experts to address future injections was reasonably necessary because Continental was seeking declaratory relief that the Fishers were not entitled to compensation for <u>any</u> injections of saltwater that might use and occupy their property, including those made in the future.

### D.     The court's rulings

Before setting forth the court's rulings on the Fishers' requests for an award of attorney fees and costs, the court notes the following:

*First*, the resources expended by *both* parties in terms attorney time and experts appears at first glance to be inordinate given the jury award and what was Continental's maximum exposure when the case was submitted to the jury.[12] As recounted earlier, the jury returned a verdict of

---

[12] Continental has not disclosed what it expended. However, during the trial, there were two out-of-state attorneys who actively participated. Continental's local counsel also made several appearances and Continental's in-house counsel was present for the entire time. In addition, Continental's formidable trial team included paralegal and technical support. Further, at least one other partner-level attorney who did not appear at trial substantially participated in early pretrial work. Finally, for most of the pretrial conferences and hearings, multiple Continental attorneys were

(continued...)

$22,440.25, which appears to be an award of $.05 per barrel of injected saltwater.  Also, the high end of the evidence and the most the Fishers stated during the trial that they were seeking was $.10 per barrel, which, if awarded by the jury, would have been a verdict of just under $45,000.

What is important to understand, however, is the complexity of this case, both legally and factually, and the lack of any relevant precedent.  Further, neither party at the commencement of the case argued for it being limited to compensation for injections of saltwater up to the date of trial with the Fishers being entitled to bring successive actions for future injections of saltwater that used and occupied their subsurface.  Rather, Continental in initiating the case sought a declaration the Fishers were entitled to not one penny for use of the subsurface..  The  Fishers, who were concerned they might have one shot at seeking compensation, sought to recover for future injections.  Here, in considering the degree of success as a factor, the court concludes it is appropriate to consider not only that the Fishers obtained an award but also the court's conclusion that they could bring successive action for future injections contrary to Continental's initial claim that the court should declare that nothing was owed—ever.

*Second*, while Continental complains that the Fishers' requested fees and costs are excessive in relation to the size of the jury verdict, it had the option of offering compensation in an amount that would have completely voided any request by the Fishers for fees and costs.  See Deadwood Canyon, 2014 WL 11531553, *1.  It also could have agreed that some compensation was owed and only contested the compensation evidence.  Finally, even in contesting liability, it could have limited

---

[12](...continued)

often on the line.  Given  the amount of legal resources Continental devoted to this case and with much of it being by out-of-state counsel who likely were charging rates greater than those used by Fishers' counsel in making their lodestar calculation, the court would not be surprised if Continental's total legal bill was twice the amount being sought by the Fishers here.

the arguments to those made based on the facts it claimed could not be disputed and not made other arguments with respect to liability that were non-starters and/or simply a re-argument of what had the court had already decided in <u>Fisher</u>.  The latter includes Continental's contention in its first motion for summary judgment that no liability was owed because of the prior severance of the mineral interests.  This amounted to taking another run at what already had been decided in <u>Fisher</u> and included a characterization of Judge Hovland's decision in <u>Fisher</u> that was absurd on its face.. <u>Continental Resources</u>, 2021 WL 665102, ** 5–6.  Then, in its second motion for summary judgment, Continental attempted to argue for the first time that an award of compensation violated its federal constitutional rights under the Contracts Clause, which claim was never pled and was a non-starter in any event.  <u>Continental Resources</u>, 2021 WL 5567303, *10.

It is apparent  this case for Continental was more about "principle" than "principal."  And, while it had the right to vigorously contest the case and make the choices it did, it must now to a certain degree live with the consequences.[13]

*Third*, given the complexity of the case and the nature of the objections, it would be a difficult task to rule on each hour of attorney and paralegal time that is in dispute.  Consequently, the adjustments the court will make with respect to the attorney fee request will be on a percentage basis.  Also, to a certain extent, the same is true for the claimed expert costs.  The propriety of doing so has been addressed in <u>Deadwood Canyon</u> where this court took this approach when considering an award of attorney and expert fees.  <u>Deadwood Canyon</u>,  2014 WL 11531553, **6–9.

---

[13]  Fishers's counsel has suggested that Continental's suit initially as well as a number of  arguments it advanced subsequently were frivolous.  The undersigned disagrees.  Here, there was no precedent applying what the North Dakota Supreme Court offered in response to certified questions from this court in another case to a particular factual setting. In fact, the court readily acknowledges that at several points it may have committed what others might determine to be error.

In making the rulings set forth below, the undersigned has carefully reviewed the time records proffered in support of the requested fees in light of the objections being made and the court's prior rulings.  Also, the court has reviewed the expert reports, the trial testimony of the experts who testified, and the court's prior rulings impacting the expert opinions that were being proffered.

      1.     **Attorney fees**

      a.     **Award of fees for work performed prior to the court's November 29, 2021 order**

For reasons that will become obvious in a moment, the court has divided the Fishers' request for attorney fees into two buckets.  The first bucket is for the time expended prior to the court's November 29, 2021 order in which it ruled  on Continental second motion for summary judgment and certain of its motions in limine.  As recounted earlier, the court in that order limited the Fishers' claims for compensation for injections of saltwater in two respects.  First, it limited the Fishers' recovery to  injections of saltwater made up to the time of trial.  Second, it limited the Fishers' recovery to the amount of injected saltwater that the evidence would demonstrate likely used and occupied their subsurface as opposed to that of their neighbors.  Also, in that earlier period, the court in its order addressing the initial cross-motions for summary judgment granted Continental summary judgment on the "reasonable use" issue.

The second bucket is for the time expended following the court's November 29, 2021 order.  No longer at issue following that order were the Fishers' claim for compensation for future injections or it earlier contention that Continental' use of their property was unreasonable.   In examining the proffered time records for the period following the court's November 29, 2021 ruling, the court has calculated that the amount of requested fees falling into this second bucket to be

$127,462.24.  Subtracting that amount from the total fees requested by the Fishers of $358,480.00 leaves $231,017.76 in the first bucket.

While sympathetic with Fishers's belief that they had only one shot at seeking compensation, particularly with Continental's request for declaratory relief that nothing was owed, the court agrees that a reduction in the requested fees falling into the first bucket is appropriate for lack of success in proving compensation for future injections.  Also, some reduction is appropriate for the lack of success based on the court's limiting the Fishers' recovery to the injected saltwater that reasonably could be shown to have occupied their property.  However, for the most part, little additional time was spent attempting to recover 100% of the injected amounts of saltwater because, for the most part, the same arguments and evidence needed to be advanced to recover the ⅓ of the injected saltwater that evidence suggested uses and occupies the Fishers subsurface.  Finally, the court agrees some reduction is appropriate for the Fishers not having prevailed on their claim that Continental's use was unreasonable.  However, not much time appears to have been spent on that issue.

The court concludes that a 25% reduction for "lack of success" is appropriate with respect to the $231,017.76 in the first bucket, leaving in that bucket $173,263.32.  The court further agrees that some further reduction in the requested fees in the first bucket is warranted for some of the reasons advanced by Continental, including work that was non-productive, duplicative, or otherwise not reasonably necessary (including work on motions never presented)—at least to the extent of requiring someone else to pay for it.  This additional reduction is 15%, leaving $147,273.81 in the first bucket.

>   **b.      Award of fees for work performed after the court's November 29, 2021 order**

With respect to the second bucket of $127,462.24, no reduction is made for "lack of success"

32

in that the issues the Fishers did not prevail upon had already been decided.  However, the court agrees that some reduction for time expended that was non-productive, duplicative, or otherwise not reasonably necessary.  The percentage reduction the court makes here is 20% and in part takes into consideration a portion (but not all) of the time spent by Attorney Anderson.[14]   This leaves $101,969.79 in the second bucket.

### c.      Total fee award of $249,243

The total of the amounts remaining in the two buckets is $249,243.60.  While a sizeable amount, this will be the court's attorney fee award based on the considerations outlined earlier.

### 2.      Expert fees

The Fishers request an award of $133,487.42 for expert fees and costs As discussed earlier, Continental only challenges the fees and expenses for Fishers' experts.

The court will exclude the fees and expenses for expert Manes since his work was exclusively directed toward the Fishers' claim for compensation based on future injections.  This amount is $23,302.54.  (Doc. No. 196-1, p. 5).

The court disagrees with Continental's contentions that nothing should be awarded for Hughes' fees and that only one-half fees for expert Button should be awarded.  Both testified at trial.  Further, given the arguments advanced by Continental for why there was no loss of use or access to the pore space that its own permit required the injected saltwater to use and occupy,

---

[14]  The Fishers' correctly point out that Continental's legal team was even larger.  Also, as already stated, the court suspects the amount of Continental's legal bill was likely substantially greater than the fees being requested by the Fishers.  However, if the shoe was on the other foot and Continental was requesting an award that included the luxury of having two attorneys try a three day trial, the court would similarly discount the fee request.  This is particularly true when trial counsel had paralegal support. And here, the court concludes that most of the paralegal hours in the second bucket were appropriate. Also, in reviewing the time records, it does appear that Attorney Anderson performed some work that advanced that reasonably advanced the ball and that not all of her time should be excluded.

obtaining the technical assistance of these experts was reasonable even if all of their work was not the subject of their trial testimony.   This includes obtaining an understanding of the geology of the formation into which the saltwater was being injected and the characteristics of the formation, including its porosity, as well as the science behind the NDIC and EPA permit requirements.   That being said, a portion these experts ' work was directed to the issue of compensation for future injections and some reduction is appropriate for that reason—more so for Button than Hughes.   But, after the court's November 29, 2001 rulings, the work by these experts was 100% directed toward the issues that Continental was teeing up for trial.

After considering all of the factors, the court will discount Hughes' fees and expenses of $24,570.72  by 10% ($2,457.07) (10%) and Button's fees and expenses of $57,394.07 by 35% ($20,087.92).

Based on foregoing rulings, the total that will be excluded for all three experts is $45,847.53. When this amount is subtracted from the total of the expert fees and costs being claimed by the Fishers of $133, 487.42, the amount the court will award is $87,639.89.

## IV.   CONCLUDING OBSERVATIONS

The undersigned circles back to the question of what must be demonstrated for property owners, like the Fishers here, who are compelled to accept the disposal of saltwater in the subsurface of their property.   As this case illustrates, what Continental claims must be demonstrated makes it difficult to prove an entitlement to compensation and likely requires the employment of costly experts and substantial additional attorney resources   to address the mechanics of reservoir operation, Darcy's law, and other factors.   Further, there is the problem of when the surface owner can sue or must sue to protect one's rights if proof of use and occupancy of the subsurface is not by

itself enough.

Perhaps, landowners not being able to pursue compensation for use of their subsurface deep below the earth's surface because of the difficulties of proving damages with evidence Continental insists is required is a desirable result.   After all, someone down the bears the costs of the landowners receiving compensation.  On the other hand, there are landowners whose subsurface is being used and occupied for disposal and storage of saltwater who are receiving compensation, particularly in situations where there is no compulsion that they take the saltwar. The Fishers' argument here is that they should be treated no differently with respect to compensation.

It is not for this court to decide what is fair under these circumstances or otherwise socially desirable.  Although the court has set forth other reasons for why the verdict in this case should stand, the undersigned's principal reason is its conclusion that the North Dakota Supreme Court would require only that the surface owners demonstrate that their subsurface is being used or occupied by the disposal of the saltwater.  In most cases, this likely can be easily demonstrated and may even be the subject of summary judgment or a stipulation.  This would leave the landowner with having to demonstrate an appropriate amount of compensation—an issue that would could be litigated for a fraction of what the parties here spent on this case.

## V.   **ORDER**

For the reasons articulated above, it is hereby **ORDERED** and **ADJUDGED** as follows:

1.   Continental's motion for judgment notwithstanding the verdict or for a new trial (Doc. Nos. 204 and 207) is **DENIED**.

2.   The Fishers' motion for attorney fees and costs (Doc. No. 194) is **GRANTED IN PART and DENIED IN PART.**  The Fishers are awarded $249,243.60 in attorney

fees and expert fees and costs in the amount of $87,639.89 for a total award of $336,883.49.  The court's judgment shall be amended accordingly.

**IT IS SO ORDERED**.

Dated this 27th day of December, 2022.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr., Magistrate Judge
United States District Court